BENTZLER, Plaintiff and Respondent, v. BRAUN and others, Defendants and Appellants: KLIMMER, Defendant.

*March 1—April 11, 1967.*

364

366

368

For the plaintiff there was a brief by *Nikolay, Jensen & Scott* of Abbotsford, and oral argument by *John J. Nikolay.*

For the defendants Braun and Northwestern National Insurance Company of Milwaukee there was a brief by *Genrich, Terwilliger, Wakeen, Piehler & Conway* of Wausau, and oral argument by *Walter H. Piehler.*

For the defendants Bergstrom and Milwaukee Mutual Insurance Company there was a brief by *Chambers, Nash, Pierce & Podvin* of Wisconsin Rapids, and oral argument by *Lloyd L. Chambers.*

CURRIE, C. J.

> *Should court have directed a verdict*
> *in favor of Braun and his insurer?*

This court on appeal is obligated to consider the evidence from a viewpoint most favorable to the respondent.[1]

---

[1] *Lundquist v. Western Casualty & Surety Co.* (1966), 30 Wis. (2d) 159, 140 N. W. (2d) 241; *Zartner v. Scopp* (1965), 28 Wis. (2d) 205, 137 N. W. (2d) 107; *Kablitz v. Hoeft* (1964), 25 Wis. (2d) 518, 131 N. W. (2d) 346; *Foellmi v. Smith* (1961), 15 Wis. (2d) 274, 112 N. W. (2d) 712.

As so viewed, we conclude that it was not error to refuse to direct a verdict in favor of Braun and his insurer. We have stated:

"In ruling on a motion for a directed verdict the trial court must view the evidence in the light most favorable to the party moved against and apply the following rule:

" ' "A verdict may properly be directed only when the evidence gives rise to no dispute as to the material issues or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion." *Rusch v. Sentinel-News Co.* (1933), 212 Wis. 530, 533, 250 N. W. 405; *Thoni v. Bancroft Dairy Co.* (1949), 255 Wis. 577, 579, 39 N. W. (2d) 690; *Wadoz v. United National Indemnity Co.* (1957), 274 Wis. 383, 390, 80 N. W. (2d) 262.' *Bruno v. Golden Bell Dairy* (1961), 15 Wis. (2d) 106, 109, 112 N. W. (2d) 199." [2]

The jury was instructed in regard to negligence on the part of Braun in regard to lookout, management and control, and speed. If there was any credible evidence produced at trial from which the jury could properly have adduced that Braun was negligent in any of these respects, the motion for directed verdict was properly denied.

*Was Braun negligent in failing
to keep a lookout to the rear?*

The trial court instructed the jury with respect to the general duty of lookout and of lookout to the rear. The testimony shows that Braun made a proper observation of the terrain ahead of him as he approached the point where the accident occurred. If he was negligent in regard to lookout, it was for failure to make an observation to his rear. The court instructed that:

[2] *Jacobson v. Greyhound Corp.* (1965), 29 Wis. (2d) 55, 64, 138 N. W. (2d) 133.

". . . it is [his] duty . . . to exercise ordinary care to keep a careful lookout ahead and about him, and to the rear if occasion requires."

Under the state of the evidence it was not error to so instruct. There was testimony that Braun intentionally slowed down to "holler" at Bergstrom and that he reduced his speed, according to Mrs. Bergstrom, to five miles per hour. There is no dispute that a rearward observation would have revealed the approach of Klimmer. The brakes were not applied, and the brake lights were not activated to warn that Braun intended to stop or slow down. While Braun also was not faced with an emergency which required that his lookout ahead or to the side be diverted, we deem this factor standing alone would not require a lookout to the rear if the brake lights had been activated. Under these circumstances if he intended to stop or slow down appreciably, he had the duty of making an observation to the rear to see that it could be done with safety. His failure to do so was lack of ordinary care.

The facts herein are to be distinguished from those cases in which we have held that the primary responsibility of a driver is to keep a lookout ahead, for here there was no danger ahead that preempted all responsibility to following traffic.

In *Statz v. Pohl*,[3] *Tesch v. Wisconsin Public Service Corp.*,[4] and *Jacobson v. Greyhound Corp.*,[5] this court adhered to the rule applied in *Thoresen v. Grything*,[6] that:

" 'The driver of the front car owes no duty to the rear or trailing car except to use the road in the usual way, in keeping with the laws of the road, and until he has been made aware of it, by signal or otherwise, he has a right to assume either that there is no other automobile in close

[3] (1954), 266 Wis. 23, 62 N. W. (2d) 556.
[4] (1957), 2 Wis. (2d) 131, 85 N. W. (2d) 762.
[5] (1965), 29 Wis. (2d) 55, 138 N. W. (2d) 133.
[6] (1953), 264 Wis. 487, 490, 59 N. W. (2d) 682.

proximity to his rear or that, being there, it is under such control as not to interfere with his free use of the road in front of and to the side of him in any lawful manner.' 5 Am. Jur., Automobiles, p. 656, sec. 280."

In *Grything, supra,* both parties had a clear view of a parked car ahead on the roadway, and though Grything made no observation to the rear, he applied his brakes, which activated the rear warning lights. He slowed down abruptly because he anticipated an invasion of the road by a person getting out of the parked car near Grything's lane of traffic. In *Tesch, supra,* the driver, Lepak, slammed on his brakes when he anticipated that an automobile might invade his lane. In that case, *supra,* page 137, we referred to the rule set forth in *Wodill v. Sullivan:* [7]

" 'When a vehicle is equipped with brake-activated stop lights as required by statute, as soon as pressure is applied to the brakes, a signal automatically occurs indicating the driver's intention to stop or diminish speed. No other signal is required by law.' "

In *Tesch,* Lepak applied his brakes. In *Statz,* the child of the operator fell out of the rear door and he was obliged to abruptly apply his brakes. In *Jacobson,* we pointed out that an operator's exemption from a rear-view lookout was not absolute:

". . . a driver ordinarily has no duty of maintaining a lookout to the rear unless a deviation from his course of travel or his position on the highway could reasonably create or constitute a hazard to drivers approaching from the rear." [8]

In *Mack v. Decker* [9] we stated:

". . . there was no requirement that Taft exercise lookout to the rear before stopping where the application of his car brakes activated the red car taillights."

---

[7] (1955), 270 Wis. 591, 598, 72 N. W. (2d) 396.

[8] *Jacobson v. Greyhound Corp., supra,* page 65.

[9] (1964), 24 Wis. (2d) 219, 231, 128 N. W. (2d) 455.

The same point was at issue in the very recent case of *St. Clair v. McDonnell,*[10] wherein we held there was no duty of lookout to the rear when the brake lights "must have been activated."

The slowing down to five miles per hour, almost to a standstill, is as hazardous on a highway at night as coming to a dead stop, and is almost impossible to discern in the absence of a signal.[11]

There is evidence that Braun in the instant case did not apply his brakes, and consequently no warning was given to following traffic. Braun, with deliberation and forethought, determined to turn around, slow down, and "holler" at Bergstrom. He was confronted with no emergency; no invasion of the lane ahead required him to rely on the assumption that following traffic was proceeding at a reasonable distance and speed. Here he created by deliberation a potential hazard, and yet he made no lookout to determine that the road immediately behind him was clear of traffic that might be affected. Under these circumstances, the jury could have found that the defendant Braun was negligent in failing to keep a lookout to the rear. The trial judge properly instructed the jury in that regard.

*Was Braun negligent in respect
to management and control?*

In reference to possible negligence of Braun, the court instructed that it was the duty of the operator:

". . . to exercise ordinary care to keep his vehicle under proper management and control to the end that when danger appears he may stop his vehicle, reduce his speed, change his course, or take such other means to avoid injury or damage as may reasonably appear proper and feasible."

---

[10] (1966), 32 Wis. (2d) 469, 475, 145 N. W. (2d) 773.

[11] *Lafferty v. Wattle* (Mo. App. 1961), 349 S. W. (2d) 519.

We consider that such instruction was improperly given under the circumstances herein existing where Braun never saw the Klimmer car prior to impact. Complete failure to maintain a lookout makes it impossible for a driver to so manage and control his car as to avoid an accident.[12] However, we deem the erroneous inclusion of the instruction on management and control not to have been prejudicial because we do not believe it probable that it affected the jury's comparison of negligence.[13]

*Was Braun negligent in travelling at an unreasonably slow speed on the highway?*

Braun slowed down to a speed of five to 15 miles per hour. Mrs. Bergstrom, who was looking at Braun's car from the south side of the road a few feet away, estimated that his speed was five miles per hour. After the conclusion of testimony, plaintiff moved to amend the pleadings to allege negligence based on the violation of sec. 346.59 (1), Stats.:

"**Minimum speed regulation.** (1) No person shall drive a motor vehicle at a speed so slow as to impede the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or is necessary to comply with the law."

The court granted the amendment, notwithstanding objection by counsel for Braun and Northwestern National Insurance Company. Sec. 269.44, Stats., governs the right to make such amendments. It provides in part that:

---

[12] *Burkhalter v. Hartford Accident & Indemnity Ins. Co.* (1955), 268 Wis. 385, 388, 68 N. W. (2d) 2, 68 N. W. (2d) 732.

[13] In order for an error to have been prejudicial and require a new trial, this court must find that but for the error there probably would have been a different result. *Carson v. Pape* (1961), 15 Wis. (2d) 300, 112 N. W. (2d) 693; *Holtz v. Fogarty* (1955), 270 Wis. 647, 72 N. W. (2d) 411.

"**Amendments of processes, pleadings and proceedings.**
The court may, at any stage of any action . . . before or
after judgment, in furtherance of justice and upon such
terms as may be just, amend any process, pleading or pro-
ceeding . . . ."

In *Girtz v. Oman*,[14] which involved an ultimate-fact
type of special verdict (the type used in the instant case),
this court held that the foregoing section:

". . . gives the trial court wide discretion as to amend-
ment of pleadings. *Grady v. Hartford Steam Boiler In-
spection & Ins. Co.* (1954), 265 Wis. 610, 617, 62 N. W.
(2d) 399; *Kuester v. Rowlands* (1947), 250 Wis. 277, 282,
26 N. W. (2d) 639."

The trial court did not in this case abuse its "wide dis-
cretion" in allowing plaintiff to amend the complaint to
conform to the proof.

Accordingly, the question of low speed as negligence
was timely raised at trial, and the propriety of the in-
struction in regard thereto is before us on appeal.

The court instructed that the:

". . . statutes . . . also provide that no person shall
drive a motor vehicle at a speed so slow as to impede the
normal and reasonable movement of traffic, except when
reduced speed is necessary for safe operation. To comply
with this statute, a driver is required to exercise ordinary
care under circumstances then and there existing."

Blashfield [15] discusses the applicability of statutes such
as Wisconsin's and states that:

". . . slowness of a vehicle may create an unreasonable
hazard to other traffic on the road.
"Some statutes, without prescribing a minimum speed,
prohibit slow-moving traffic, where such traffic is a haz-
ard to life, limb, or property or where it blocks or impedes

---

[14] (1963), 21 Wis. (2d) 504, 509, 124 N. W. (2d) 586.
[15] 2 Blashfield, Automobile Law and Practice (3d ed.), p. 306,
sec. 105.5.

the normal and reasonable movement of traffic. Such statute applies whether the traffic impeded is approaching from the front, from the rear, or from both directions. Traffic in the vicinity, other than the slow-moving vehicle and a following vehicle, is not necessary to make the slow-speed statute applicable. The statute does not apply to a vehicle until it has been on the highway a sufficient time to attain a normal speed."

The Montana court in *Hageman v. Townsend* [16] stated:

"The general rule in states having slow speed statutes like Montana's is that the statute may be used as a basis for liability. The purpose for the statute is rooted in recognition that the slow driver may be the cause of fatal highway accidents as well as the fast driver. Netterville v. Crawford, 233 Miss. 562, 103 So. 2d 1; Lafferty v. Wattle (Mo. App. 1961), 349 S. W. 2d 519; Griffin v. Illinois Bell Telephone Company, 34 Ill. App. 2d 87, 180 N. E. 2d 228; Seaton v. Spence, 215 Cal. App. 2d 761, 30 Cal. Rptr. 510; Anno. 66 A. L. R. 2d 1194."

The Montana court in the cases cited predicated liability upon a statute almost identical to our own. It provides:

"(a) No person shall drive a motor vehicle at such a slow speed as to impede or block the normal and reasonable movement of traffic except when reduced speed is necessary for safe operation or in compliance with law." [17]

In the instant case, although there was evidence that it was a rainy and misty night, there was no evidence that could lead to the conclusion that such reduced speed was necessary for the safe operation of the vehicle. The record shows that, prior to the time Klimmer slowed down near the scene of the accident, he was travelling at a speed of 35–45 miles per hour. The wrecker operator who

[16] (1965), 144 Mont. 510, 514, 398 Pac. (2d) 612.
[17] 3 Revised Code of Montana (1947), p. 223, sec. 32–2147.

was coming to pull out the mired Bergstrom car was proceeding at a speed of 50 miles per hour. The traffic officer stated that he drove to the scene at an estimated 40 miles per hour. Braun's low speed was not for a reason recognized by the statute—a speed of little more than five miles per hour was not necessary for the safe operation of the vehicle nor in compliance with the law—it was solely because of the decision of Braun to tell Bergstrom that a wrecker was on the way. Under these circumstances, it was not error for the trial court to instruct the jury in regard to slow speed and, under the facts of this case, for the jury to find Braun negligent for operating at too slow a speed under the circumstances.

### Duplicity of instructions.

The appellants also contend that the instructions submitted to the jury were duplicitous and that the instructions in regard to management and control, lookout, and speed were overlapping, and as a consequence undue emphasis was placed upon these elements by the jury. We have, however, heretofore concluded that the concept of duplicitousness is not applicable in a situation of this kind. In *Merlino v. Mutual Service Casualty Ins. Co.,*[18] we said:

"We deem it inadvisable to extend the concept of duplicity to the area of the instructions to the jury. One of the considerations which prompted this court to amend sec. 270.27, Stats., in 1961 under its rule-making power, so as to permit questions in a special verdict to be framed in terms of ultimate fact, was that this would tend to eliminate duplicitous verdicts. Duplicitous verdicts which find overlapping elements of negligence are bad because of their likely effect on the jury in answering the comparative-negligence question. Where a single negligence question framed in terms of ultimate fact is submitted,

[18] (1964), 23 Wis. (2d) 571, 584, 127 N. W. (2d) 741.

we deem it unlikely that the jury will segregate particular elements of negligence and assign to each element a certain percentage in answering the comparative-negligence question. Rather we think juries will tend to take an overall view of the negligence of each participant in apportioning percentage of fault. Therefore, even though a trial court instructs on overlapping elements of negligence, this in itself does not constitute error."

*Negligence of Bergstrom in permitting lights to shine across the highway.*

It was undisputed that Bergstrom was mired at the south side of the road with the left front of his vehicle either tangent to the paved portion of the highway or quite close thereto. The angle formed by the side of the Bergstrom automobile and the edge of the road was approximately 30 degrees, so that the headlights shined generally in a northeasterly direction across the road. There was testimony that Bergstrom's lights were in a depressed position. However, the rear end of the Bergstrom car had settled into the mud, so that the front of the vehicle was cocked upward and the beams were approximately three or four feet above the surface of the highway at the point where they intersected the position just behind the Braun car and where the collision took place. There was also testimony that Bergstrom had, prior to the time Klimmer came over the hill, flicked his headlights off and on to warn oncoming vehicles of his position. He did not do this upon the approach of the Klimmer vehicle. There was evidence to show that Klimmer was completely blinded by the glare of the Bergstrom headlights. The trial judge instructed the jury that ". . . you can consider the question of negligence and causal negligence as to the operation of the lights" on the Bergstrom automobile. The jury assessed Bergstrom's negligence at 27½ percent. Counsel for Bergstrom takes the position that he was under a statutory

duty to have lights visible from a distance of 500 feet.[19] He contends that, under the conditions of mist and rain then and there existing, only Bergstrom's head lamps would have provided the illumination required by sec. 347.27, Stats. Counsel, however, overlooks the provisions of sec. 347.08 (1) providing that:

"Whenever this chapter states a requirement as to distance from which certain lamps and devices shall render objects visible . . . such distance shall be measured . . . under normal atmospheric conditions . . . ."

The committee note of the legislature appearing in 40 W. S. A., p. 608, sec. 347.27, Stats., states with respect to 1 (b) that:

"An ordinary automobile will of course comply simply by having its tail lamps and parking lamps lighted."

It is therefore apparent that Bergstrom cannot escape from a finding of negligence in the operation of his headlights on the basis of his statutory duty, since his statutory duty could have been complied with by using the parking lights alone.

[19] Sec. 347.27, Stats., in relevant part provides:

"When lighted lamps required on parked vehicles. (1) No person shall park or leave a vehicle standing, whether attended or unattended, upon a roadway or the shoulder immediately adjacent thereto during hours of darkness unless: . . .

"(b) Such vehicle displays one or more lighted lamps meeting the following requirements:

"1. At least one lamp shall display a white or amber light visible from a distance of 500 feet to the front of the vehicle, and the same lamp or at least one other lamp shall display a red light visible from a distance of 500 feet to the rear of the vehicle.

"2. The location of such lamp or lamps shall always be such that at least one lamp or combination of lamps meeting the requirements of this section is installed as near as practicable to the side of the vehicle which is closest to passing traffic.

"3. If the vehicle is equipped with 2 parking lamps and 2 tail lamps, both parking lamps and both tail lamps shall be lighted.

"(2) Any lighted head lamps on a vehicle parked on a highway shall be depressed or dimmed."

Sec. 347.27 (2), Stats., is also relevant to a determination of Bergstrom's negligence. It provides that "Any lighted head lamps on a vehicle parked on a highway shall be depressed or dimmed." Under the circumstances, although Bergstrom manipulated his headlight switch so that the lights would ordinarily have been in a depressed position, the position of the car projected his light beams across the road as though they were in a high or driving position. Construing, as we must, the facts in a manner most favorable to the prevailing party, there is evidence to indicate that Bergstrom's head lamps interfered with the vision of approaching automobiles. The fact that Bergstrom had theretofore flicked the lights on and off also had probative value tending to show that Bergstrom knew and recognized the danger that the angle of his light beam created for approaching vehicles. Under the facts and circumstances of this record, a jury question was properly presented in respect to Bergstrom's negligence. It was not error for the judge to instruct in regard to the operation of his headlights, and there is evidence of record to support the verdict finding Bergstrom causally negligent in that respect.

*Negligence of Klimmer as an intervening and superseding cause of the accident.*

Braun contends that the negligence of Bergstrom or Klimmer or both of them constitutes an intervening and superseding cause of the accident. Bergstrom joins in this contention in respect to the negligence of Klimmer.

Neither the conduct of Bergstrom with respect to his headlights nor the conduct of Klimmer in failing to see the taillights of Braun ahead of him and proceeding blindly in the glare of Bergstrom's headlights constituted intervening causes.

The negligence of Braun, Bergstrom, and Klimmer were concurring causes of the accident. Each act of neg-

ligence was a substantial factor in bringing about the result. In *Merlino v. Mutual Service Casualty Ins. Co.*[20] and *Ruff v. Burger*,[21] we quoted with approval from Restatement, Torts (2d), the rule with respect to concurring causes:

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious, or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability." [22]

An intervening cause is defined by the same authority as:

". . . one which actively operates in producing harm to another after the actor's negligent act or omission has been committed." [23]

Prosser defines intervening cause similarly:

"An intervening cause is one which comes into active operation in producing the result *after* the negligence of the defendant. 'Intervening' is used in a time sense; it refers to later events." [24]

Without an intervening force or act of negligence there can be no superseding cause. We have previously determined that whether an intervening cause is a superseding cause presents a matter of law for the trial court to decide after the verdict.[25]

---

[20] *Supra*, page 579.

[21] (1966), 32 Wis. (2d) 141, 145 N. W. (2d) 73.

[22] Restatement, 2 Torts (2d), p. 464, sec. 439.

[23] Ibid. page 465, sec. 441.

[24] Prosser, Law of Torts (hornbook series, 3d ed.), p. 309, sec. 51.

[25] *Strahlendorf v. Walgreen Co.* (1962), 16 Wis. (2d) 421, 430, 114 N. W. (2d) 823; *Ryan v. Cameron* (1955), 270 Wis. 325, 331, 71 N. W. (2d) 408; *Merlino v. Mutual Service Casualty Ins. Co.* (1964), 23 Wis. (2d) 571, 580, 127 N. W. (2d) 741.

In *Merlino* we adopted the test laid down by the Restatement to determine superseding cause and suggested that the trial court be governed by the standards set forth therein.

The pertinent section of the Restatement provides:

"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

"(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

"(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

"(c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent." [26]

Braun should have realized when he suddenly lowered his speed that a third person might act as Klimmer did, particularly in view of the diminished visibility and the blinding effect of Bergstrom's lights. So also Bergstrom should have realized that his conduct in permitting his lights to glare across the path of oncoming traffic substantially increased the risk of a collision with the rear of the Braun car. Certainly, the negligence of Klimmer and Bergstrom was not "highly extraordinary."

In *Merlino* we stated:

". . . in order for the intervening act of negligence to constitute a superseding cause it must be such that the conscience of the court would be shocked if the first actor were not relieved from liability." [27]

After a perusal of the record, our conscience is not shocked by the imposition of a liability upon Braun and Bergstrom. Their acts of negligence, together with the

[26] Restatement, 2 Torts (2d), p. 478, sec. 447.
[27] *Supra,* page 581.

acts of Klimmer, were each "substantial factors" that concurred in producing the accident.

*Negligence of Janet Bentzler in failing to use seat belts.*

It is undisputed that the Renault automobile in which Janet Bentzler was a passenger was equipped with seat belts. At the time of the accident, however, she was not using them. As the result of the rear ending of the Braun automobile, she was apparently thrown forward and received severe facial injuries, the loss of teeth, and sustained a severe compound fracture of the right thigh and knee and a fracture of the lower left leg. Counsel for Bergstrom requested the following instructions:

"The Klimmer automobile in which the plaintiff, Janet Bentzler, was a passenger was equipped with a safety belt in the right front seat in which Janet Bentzler was riding at the time of the accident. If you find that the seat belt was in working order and that Janet Bentzler was not wearing the seat belt at the time of the accident, then you must find her negligent.

"If you find the plaintiff, Janet Bentzler, negligent with regard to use of a safety belt you are then to determine if use of a safety belt would have eliminated or reduced the injuries sustained. If you find that the injuries sustained would have been eliminated or reduced by use of a safety belt, then a failure to use a safety belt is a cause of the injuries and damages sustained."

This request was denied, as was Braun's request for a special verdict question inquiring as to the negligence of Janet Bentzler in failing to use a seat belt. There was, however, a general question pertaining to Janet Bentzler's negligence and whether such negligence, if any, caused her injuries. Counsel were allowed to argue to the jury whether it was negligence to fail to use available seat belts. In response to the question:

". . . was the plaintiff Janet Bentzler negligent in regard to the care she exercised for her own safety."

The jury answered, "Yes."

However, the jury found that such negligence was not the cause of her injuries. On this appeal both Braun and Bergstrom argue that the court erred in failing to instruct the jury in regard to plaintiff's use of seat belts.[28] It is argued that the seat belt law, sec. 347.48, Stats.,[29] not only requires that cars be equipped with seat belts but that the failure to use them when available constitutes negligence. The statute requires the installation of seat belts but does not explicitly require that the seat belts be used after installation. A 1967 Wisconsin Law Review article discusses this question:

". . . a more probable alternative is that the statute does not require use by implication. A study of the legislative history of sec. 347.48, Stats., does not indicate an implied purpose to require the use of seat belts. The purpose of chapter 521, Wisconsin laws of 1961, is to require 'installation of safety belts in automobiles.' Sec. 347.48 was amended in 1963 by chapter 448, Wisconsin laws of 1963. The purpose of this amendment related to 'maintenance of seat belts after their installation.' In

[28] For a discussion relating to the issue of the nonuse of available seat belts as contributory negligence and two Wisconsin circuit court decisions which have dealt with the issue see Note: Seat Belts & Contributory Negligence, 12 South Dakota Law Review (1967), 130.

[29] Sec. 347.48. "Safety belts. (1) SAFETY BELTS REQUIRED. It is unlawful for any person to buy, sell, lease, trade or transfer from or to Wisconsin residents at retail an automobile, which is manufactured or assembled commencing with the 1962 models, unless such vehicle is equipped with safety belts installed for use in the left front and right front seats thereof, and no such vehicle shall be operated in this state unless such belts remain installed.

"(2) TYPE AND MANNER OF INSTALLING. All such safety belts must be of a type and must be installed in a manner approved by the motor vehicle department. The department shall establish specifications and requirements for approved types of safety belts and attachments thereto. The department will accept, as approved, all seat belt installations and the belt and anchor meeting the society of automotive engineers' specifications."

neither case was use mentioned or considered as part of the statutory policy.

". . . it's certainly arguable that the purpose of the legislature was merely to make seat belts available for use and thus further develop and implement the seat belt safety campaign. This position becomes more tenable in view of the fact that safety belts are required only in automobile models of the year 1962 or later, and are required only in the front seats of an automobile. Thus, the statute does not appear to be an absolute safety measure. If the legislature was concerned with implementing the use of seat belts, it seems plausible that belt installation would have been required for all cars in all seats." Roethe, Seat Belt Negligence in Automobile Accidents.[30]

It seems apparent that the Wisconsin legislation, which does not require by its terms the use of seat belts, cannot be considered a safety statute in a sense that it is negligence *per se* for an occupant of an automobile to fail to use available seat belts. Two recent cases have discussed this problem. In the case of *Kavanagh v. Butorac,*[31] the Indiana court of appeals concluded that it could not say, as a matter of law, that failure to use available seat belts is contributory negligence. *Brown v. Kendrick,* a 1966 Florida case,[32] held that it was not error to refuse to permit an automobile owner sued by a guest passenger to offer evidence of the guest's failure to use an available seat belt. The court concluded that the law did not require the use of seat belts or impose an element of negligence for the failure to use them.

While we agree with those courts that have concluded that it is not negligence *per se* to fail to use seat belts where the only statutory standard is one that requires the installation of the seat belts in the vehicle, we nevertheless conclude that there is a duty, based on the common-law standard of ordinary care, to use available seat belts independent of any statutory mandate.

[30] 1967 Wisconsin Law Review, 288.

[31] (Ind. App. 1966), 221 N. E. (2d) 824.

[32] 192 So. (2d) 49.

A recent publication has collected some of the statistics in regard to the effectiveness of seat belts. The publication, "For the Defense," dated February, 1966 (Vol. 7, No. 2), claims that, in a study of 79 fatal accidents, 34 percent of them would have been nonfatal if seat belts were used. A study by the San Diego, California, police department, which is referred to in the article, indicates that in a period when 282 motorists were injured and eight killed:

"Seat belts would have *saved* five lives. They would have *prevented* 49% (139) of the injuries, *lessened* 21% (60), and lessened or prevented 9% (26). In 6% (14) they would have had an unknown effect, and no effect in 15% (43) of the cases."

It is claimed that seat belts could save 5,000 lives annually.[33] The American Trial Lawyers Association (ATLA) has reached parallel findings:

"The use of seat belts lowered the 1964 accident toll by about 750 deaths. Only 30% of passenger cars have seat belts installed and these are only used 50% of the time. Full installation and *use* of seat belts could reduce deaths by 5,000 annually and serious injuries by one third. It has been shown that many of these deaths are caused by persons in the car striking portions of the car or being thrown out of the car by serious impact."[34]

While it is apparent that these statistics cannot be used to predict the extent or gravity of injuries resulting from particular automobile accidents involving persons using seat belts as compared to those who are not using them, it is obvious that, on the average, persons using seat belts are less likely to sustain injury and, if injured, the injuries are likely to be less serious.[35] On the basis of this

---

[33] 14 DePaul Law Review (1964), 152.

[34] "Stop Murder by Motor," page 9, ATLA Monograph, January, 1966.

[35] Roethe, Seat Belt Negligence in Automobile Accidents, *supra*, footnote 30, compiles convincing statistics demonstrating the effectiveness of seat belts in preventing personal injuries. That portion of the article with its footnotes is reprinted herewith and appended hereto as an appendix.

experience, and as a matter of common knowledge, an occupant of an automobile either knows or should know of the additional safety factor produced by the use of seat belts. A person riding in a vehicle driven by another is under the duty of exercising such care as an ordinarily prudent person would exercise under similar circumstances to avoid injury to himself. This court has said that, "The basis for negligence of a guest is his failure to exercise ordinary care for his own safety." *Theisen v. Milwaukee Automobile Mut. Ins. Co.*[36] In that same case, we stated at page 106:

"The test of the guest's negligence is whether under the circumstances he acted with the care a reasonably prudent man would have used under the circumstances. His negligence so determined is based on his duty to use ordinary care as a guest under the circumstances for his own safety."

The question, therefore, is not whether the guest's negligence contributed to the cause of the accident but, rather, whether it contributed to the injuries. In view of the Wisconsin statutes that the legislative mandate in regard to seat belts applies merely to installation and not to use, the failure to use available seat belts is a question for determination by the jury as in the case of any ordinary negligence, *i.e.*, was the conduct a substantial factor in producing a result.

We therefore conclude that, in those cases where seat belts are available and there is evidence before the jury indicating causal relationship between the injuries sustained and the failure to use seat belts, it is proper and necessary to instruct the jury in that regard. A jury in such case could conclude that an occupant of an automobile is negligent in failing to use seat belts. In the instant case, however, because of the lack of any evidence of causation, the trial judge properly refused the requested instruction. There was proof that seat belts were avail-

---

[36] (1962), 18 Wis. (2d) 91, 104, 118 N. W. (2d) 140, 119 N. W. (2d) 393.

able and were not used, but that fact alone does not prove causation, for the driver of the vehicle also failed to use the available seat belts, but his injuries were minimal. In motions after verdict the trial judge stated that there was a complete failure of proof in that regard:

"There is no evidence, by expert witnesses or otherwise, that Janet Bentzler's injuries would have been reduced or minimized had she been wearing a seat belt. The jury could only speculate as to whether her injuries would have been less severe."

The only witness offered was an orthopedic surgeon, who, although qualified in his chosen profession, did not purport to be able to testify what effect the use of seat belts might have had in this particular case. The record supports the trial court's determination that there was no proof whatsoever to show that Janet Bentzler's injuries were caused or aggravated by the failure to use the seat belts. In the absence of credible evidence by one qualified to express the opinion of how the use or nonuse of seat belts would have affected the particular injuries, it is improper for the court to permit the jury to speculate on the effect that seat belts would have had.

While in this case there was evidence that could have sustained the court's finding that Janet Bentzler was negligent in failing to wear the seat belts, that negligence could only have been related to her negligence in using ordinary care to protect herself from injuries and could not have been negligence that was a factor in producing the crash. In the absence of any proof of causation, the court properly refused the requested instruction on the question of Janet Bentzler's negligence in the use of seat belts.

*Damages for personal injury.*

The jury awarded Janet Bentzler a total of $37,855.90, of which $2,355.90 was for hospital and medical bills,

$3,500 for wage loss to date of trial, and $32,000 for personal injuries. The trial court denied a motion to reduce the damages for loss of wages to $3,000 and for personal injuries to $20,000. The judge, in his memorandum opinion on this motion, stated:

"Now, as to Janet Bentzler's injuries and the severity thereof. The jury saw Janet Bentzler; they saw her permanently crippled leg; they saw the x-rays revealing the steel plates, the screws, nuts, bolts and washers that were permanently placed in her leg to hold the bones together; they saw her walk with a limp and heard her state of her physical limitations and the pain she has and the activities she can no longer do. They heard Dr. Mason state arthritis is practically a foregone conclusion for her. The fact it hasn't shown up yet I suppose might be by reason of her age, she is only 25 now.

"The jury is aware of the constantly increasing spiral of inflation, and I can't say as a matter of law that $32,000 is excessive in this instance in view of the severity of the injuries which this plaintiff has sustained."

In the recent case of *Ballard v. Lumbermen's Mut. Casualty Co.*,[37] we stated:

". . . we have repeatedly said that this court will view with particular favor a verdict that has the trial judge's approval."

We also pointed out in that same case that:

". . . that attitude on the part of the supreme court presupposes that there has been some analysis of the evidence underlying the verdict and that such analysis appears in the trial judge's memorandum."

The memorandum of the trial judge quoted in part above conforms with this requirement. In addition, there is evidence that Janet Bentzler was hospitalized for six weeks and bedridden for five months, and that she had her right leg in a cast from the waist down for that entire period. There was evidence that she suffered severe pain

---

[37] (1967), 33 Wis. (2d) 601, 606, 148 N. W. (2d) 65.

for almost that entire time. When the cast was removed, a severe skin infection that caused permanent scarring was discovered. She is expected to have a permanent limitation of motion, a light limp, and some permanent pain. The wage losses are completely supportable by the evidence.

Viewing this verdict and judgment as we must, in the light most favorable to the prevailing party, it is clearly supported by the evidence:

"A damage verdict which has been approved by the trial court will not be disturbed if 'there exists a reasonable basis for the trial court's determination after resolving any direct conflicts in the testimony in favor of the plaintiff.' " [38]

We conclude that the damages are reasonable and should not be disturbed on this appeal.

*Comparison of negligence.*

We also conclude that the comparison of negligence is particularly within the province of the jury and will not be set aside unless clearly in error.[39] While we would have been better satisfied if the jury had apportioned a greater percentage of negligence to Klimmer, we cannot disturb the comparison made by the jury as being erroneous.

*By the Court.*—Judgment affirmed.

HANSEN, J., took no part.

[38] *Kablitz v. Hoeft* (1964), 25 Wis. (2d) 518, 525, 131 N. W. (2d) 346.

[39] *Milwaukee & Suburban Transport Corp. v. Royal Transit Co.* (1966), 29 Wis. (2d) 620, 139 N. W. (2d) 595; *Ide v. Wamser* (1964), 22 Wis. (2d) 325, 126 N. W. (2d) 59; *Niedbalski v. Cuchna* (1961), 13 Wis. (2d) 308, 108 N. W. (2d) 576; *Korleski v. Lane* (1960), 10 Wis. (2d) 163, 102 N. W. (2d) 234.

APPENDIX.

"Seat Belt Negligence in Automobile Accidents. . . . II. Standard of ordinary care. (a) A factual study.

"One of the major purposes of seat belts as a safety device is to prevent ejection from the car. This assumes that one is safer inside the car, although the popular notion still exists that the chance for survival is better if one is thrown from the car. Statistics from the Automotive Crash Injury Research program (ACIR) bears out the assumption that a person who remains in a car is safer. The fatality ratio of persons ejected is five times greater than those who remain in the car.[7] Further, seat belts also reduce fatalities about 35 percent in all accidents.[8] Common sense may indicate that this is true in most automobile accidents, but would a person using a seat belt be safer where the car was submerged or where the car started on fire? Fire and submersion, however, in automobile accidents are relatively freak occurrences,[9] and a belted motorist has a better chance of remaining conscious and extricating himself when confronted with such a situation. A consideration of all injury producing accidents by the ACIR indicated that there was a 60 percent decrease in all types of injuries where seat belts were used.[10] These statistics indicate

[7] Tourin, Ejection and Automobile Fatalities, in 73 U. S. Public Health Reports 381–83 (1958).

| | not fatally injured | fatally injured | total | % fatally injured |
|---|---|---|---|---|
| Ejected | 876 | 121 | 997 | 12.1 |
| Not ejected | 5843 | 147 | 5990 | 2.5 |
| Total | 6719 | 268 | 6987 | 3.8 |

[8] Tourin and Garrett, Seat Belt Effectiveness in Rural California Accidents, Automotive Crash Injury Research (Feb. 1960; Cornell Aeronautical Laboratory, Inc., of Cornell University, Buffalo 21, N. Y.).

[9] Gagen, Seat Belts: No Longer Why, But Why Not?, Today's Health, July 1960, p. 26. Fire occurred in only two-tenths of one percent of all injury producing accidents. Submersion occurred in only three-tenths of one percent of all injury producing accidents.

[10] Introduction to The Seat Belt Story, *op. cit. supra* note 1.

that the seat belt is a valid safety device which significantly reduces injuries and fatalities in all accidents.[11]

"The possible factual drawback to requiring the use of seat belts as part of the duty to exercise ordinary care is the belief that seat belts might increase the frequency or severity of certain injuries, particularly in the abdominal region. This aspect of seat belt use was also studied by the ACIR program and the results were published in an article entitled 'The Seat Belt Syndrome.'[12] The findings of the study strikingly reject the seat belt as a significant cause of injury in the automobile accident. The percentage of serious injuries to lower body regions while wearing a seat belt (17 percent) compared favorably with serious injuries to lower body regions of those not wearing a seat belt (19 percent). Furthermore,

[11] Gagen, *supra* note 9, mitigates the notion that seat belts are unnecessary in low speed traffic or when driving close to home. The statistics indicate that forty-seven percent of all fatal accidents in 1958 occurred at speeds below 40 miles per hour. Sixty-six percent of all fatal accidents occurred within twenty-five miles of the home.

[12] Garrett & Braunstein, The Seat Belt Syndrome, 2 Journal of Trauma 220 (1962). The principal aim of this study was to determine whether seat belts were a direct cause of the injury. This was accomplished by limiting the scope of the study to the abdomen-pelvis and lumbar-spine injuries. The study only involved automobile accidents where one of the occupants wore a seat belt; and of all the 944 people receiving injuries who wore a seat belt, only 150 received injuries to the lower torso-abdomen, pelvis or lumbar area. This was a percentage of 15.9 which favorably compared to the frequency of injury to this lower body area among nonbelt users (15.4).

Following is a table breaking down these injuries:

| Lower torso Injuries | Number | Percent |
|---|---|---|
| Bruises or contusions only | 77 | 51.3 |
| Sprains or strains of muscles | 47 | 31.3 |
| | | minor-83 |
| Spinal contusions or subluxations | 4 | 2.0 |
| Fracture, pelvis | 7 | 4.7 |
| Fracture, lumbar spine | 8 | 6.0 |
| Internal injuries | 7 | 4.7 |
| | | serious-17 |
| Total | 150 | 100.0 |

Id. at 225.

a large percentage of the serious injuries to lower body regions of those wearing seat belts could not be traced to the belt itself because of the lack of bruises and contusions which generally result from the 'snubbing' action of the belt.[13] The conclusion of the study was that the seat belt was a safe restraining device and the number of injuries that could be traced to the belt itself was small.

"The above factual study reveals the minimal statistical support for arguments against wearing seat belts, while demonstrating the great benefits that can be derived."