CIERPISZ *v.* SINGLETON, ETC., ET AL.

[No. 387, September Term, 1966.]

*Decided June 27, 1967.*

216

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, BARNES, MCWILLIAMS and FINAN, JJ.

*Frederick J. Green, Jr.,* with whom were *Lord, Whip, Cough-lan & Green* on the brief for appellant.

*Allan Heneson* for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

We are urged to say, for the first time, that the failure of a guest to make use of the seat belt provided by the host is, per se, evidence of contributory negligence.

On 25 July 1964 the appellant (Cierpisz) was 17 years old, single and the owner of a new Corvair. The appellee, Phyllis Kay Singleton (Phyllis), aged 19, was, at the time, his fiancée. It was about 7:30 P.M. when they left her home in Baltimore "to go for a ride." At 9:30 they were in Harford County travel-ing east on the Jarrettsville Road, 19 feet wide, with shoulders 3 feet wide, and divided into two lanes by a white line. The surrounding countryside is generally level and "open." The night was clear; the road was dry.

About a mile from the place of the accident Arthur P. Berg-man, Jr. entered the Jarrettsville Road just ahead of Cierpisz. He and his passenger were going to visit Joey Ellis who lives on the right (south) side of the road. The collision occurred when Bergman attempted a right turn into the Ellis driveway. The driveway, which crosses a shallow drainage ditch along-side the road, is 6 feet wide. There is no flare or apron where it joins the road and it was agreed that to make a right hand turn into the driveway, without getting into the drainage ditch, one first had to swing to the left of the center line.

According to Cierpisz he was about 100 feet behind Bergman as they approached the Ellis driveway. He said he saw Berg-man's "left blinker go on" and that when Bergman "applied his brakes" he (Cierpisz) "started slowing down." When Berg-

man "started going into the left lane * * * [he] imagined he [Bergman] was turning into the left side of the road." He couldn't see whether there was an intersecting "road over there —because it was dark." As Bergman "got into the left lane * * * [Cierpisz] started passing him on the right and he [Bergman] just swerved back and hit * * * [him] and knocked * * * [him] into the ditch and then skidded off."

Bergman was familiar with the area. He testified that when he turned on his "blinker * * * to make a right hand turn" he saw a car about 300 feet back of him. He said "it was so far back" that he didn't "pay much attention to" it. When he "went to turn in" Cierpisz collided with him. The photographs show damage along the right side of Bergman's car and along the left front and side of the Cierpisz car. He admitted he went about a foot to the left of the center of the road before turning right. Cierpisz, on the other hand, said "more than 75%" of Bergman's car went to the left of the center line. Later he said Bergman "was entirely to the left of the center."

Cierpisz said he was "practically abreast" of Bergman when he (Bergman) turned. He described it as a "sudden whipping to the right." At the moment of impact, Cierpisz said, none of his wheels was on the shoulder. He estimated his speed to have been 20 miles per hour and Bergman's to have been 10 miles per hour when the cars collided. Bergman said he had "just about come to a complete stop."

Phyllis' description of the accident was much the same as that of Cierpisz. She said Bergman "put on his left blinker." She told how she was injured when she was thrown up against the rear view mirror. Asked why she did not use the seat belt she said, "There was no reason to, it seemed to me."

Charles Thomas Gast lives about 150 feet east of the Ellis driveway on the opposite side of the road. He was 15 years old on the night of the accident. He went outside to close up his chicken house and after he had done so he lingered a while to smoke a cigarette because smoking in the house was verboten. He said he saw a car (Bergman) coming toward him with its turn signal flashing to indicate a turn to the right. He saw the car "slow down and almost come to a stop." He saw also another car (Cierpisz) coming around the curve about 500 feet

west of the Ellis driveway. He said "he was doing a good rate of speed for the curve he was on." He told how Bergman "started to slow down to make his curve, turn in, * * * and the other car didn't slow down. He hesitated a little bit and then he squealed his brakes and collided with Art." At the moment of collision Cierpisz, he recalled, was "half on the road and half off" on the dirt shoulder. He thought Bergman had "pulled about a foot to a foot and a half to the left" of his line of travel before turning to the right. Gast's parents had been living there for 5 or 6 years. He and Bergman were school friends.

The case was tried before Sodaro, J. and a jury on 9, 10 and 11 May 1966. Cierpisz, when the evidence was concluded, asked the court to instruct the jury that there was evidence sufficient to support a finding that Phyllis was guilty of contributory negligence because she failed to warn the driver of the approaching danger. He also asked the court to instruct the jury as follows:

> "17. If you find that the Cierpisz vehicle was equipped with seat belts, that the infant plaintiff was not using the belt provided for the passenger in the right front seat at the time of the happening of this accident, and that if she had been using it she would not have struck her left cheek on the rear view mirror of the automobile, then you may find that the complained of injury to her upper left cheek just below the left eye and the resultant scar were due to her failure to use the seat belt and that, therefore, she cannot recover therefor in this action."

In his charge the trial judge instructed the jury that "as a matter of law" there was no evidence in the case "legally sufficient to prove that * * * Phyllis * * * was guilty of any negligence contributing to her injuries." The seat belt instruction was specifically refused and no mention of seat belts was made in the charge. The jury returned a verdict of $7,500 in favor of Phyllis against both Bergman and Cierpisz. A verdict of $2,000 was also returned in favor of her mother against both defendants. The trial judge indicated he would grant the

motions for a new trial unless plaintiffs filed a remittitur of $2,000. As a result the judgments made absolute were for $6,500 and $1,000 respectively. Both Bergman and Cierpisz appealed. Bergman dismissed his appeal on 19 July 1966.

## I.

Cierpisz invites our attention first to the court's refusal to submit to the jury the issue whether Phyllis is to be charged with contributory negligence "in failing to correctly observe" Bergman's actions and "in failing to warn [Cierpisz], when there was ample time to do so." If Bergman had signalled for a right turn, he argues, she had "precisely the same opportunity to observe it" as did he, and when he attempted to pass to the right of Bergman "there was plenty of time" for her to realize that he "had misinterpreted the signal" and to warn him that Bergman intended to turn to the right. He suggests that if he is to be found negligent in "misinterpreting or misreading the right turn signal" she must be declared equally negligent. Cierpisz seems to be taking it for granted that his negligence could arise only out of his failure to observe the right turn signal. We think there was other evidence sufficient to support a finding that Cierpisz was negligent. Gast, for instance, said he was "half on the road and half off" on the dirt shoulder. Gast also said Bergman went to the left of his line of travel only "a foot to a foot and a half." Since Cierpisz admitted he could not see any intersecting roads or streets the jury might well have concluded he was negligent in attempting to crowd past Bergman on the shoulder instead of waiting for an unclear situation to fully develop.

We have not found in this record any evidence that Cierpisz at any time before reaching the scene of the accident was inattentive, reckless, incompetent or in any way indifferent to the safety of himself or his fiancée. Other than Gast's comment that "he was doing a good rate of speed for the curve he was on" there is nothing to support a finding that his speed was unlawful, unreasonable or improper. Nor does the evidence suggest that Phyllis observed anything he did not observe or that she was at any time under the impression that she was observing something that was not readily apparent to Cierpisz. It should be

noted also that the dangerous situation developed suddenly and proceeded to its denouement in a few seconds.

In support of his contention Cierpisz has directed our attention to a number of our earlier decisions.[1] In all of them we find factual disparities which make the quoted excerpts inapplicable to the instant case. In our judgment *State v. Lupton,* 163 Md. 180, 191, 161 Atl. 393 (1932) and the earlier cases therein discussed are controlling here. In *Lupton* the driver turned left in the path of an approaching car. Holding that the trial judge erred in submitting to the jury the issue of the contributory negligence of the guest, Judge Adkins, for the Court, said:

> "* * * There is not the slightest indication from anything that appears in the record that at any time prior to the moment of making the turn the driver was careless or incompetent in any respect, or that he needed any warning to prevent him from turning his car in front of an approaching car which was plainly visible, or that the passenger had time to give the warning after the intention to make the turn was discovered. A passenger would be not only a nuisance but a menace if he were required to be constantly warning the driver of the approach of cars plainly visible to him, and that without regard to distance of the approaching car."

In *Kent County v. Pardee,* 151 Md. 68, 76, 134 Atl. 33, 36 (1926), it was said:

> "We think it is only where the driver is acting in a careless manner, or is approaching a danger which is known to the guest and unknown to or not apprehended by him (the driver), that any duty devolves

---

1. *Ferguson, Adm'x v. Wootten,* 240 Md. 186, 213 A. 2d 498 (1965); *Garozynski v. Daniel,* 190 Md. 1, 57 A. 2d 339 (1948); *State v. Penn. R. R. Co.,* 190 Md. 586, 59 A. 2d 190 (1948); *Dashiell v. Moore,* 177 Md. 657, 11 A. 2d 640 (1940); *Montgomery Bus Lines v. Diehl,* 158 Md. 233, 148 Atl. 453 (1930); *Balt. C. & A. R. Co. v. Turner,* 152 Md. 216, 136 Atl. 609 (1927); *United Rys. v. Biedler,* 98 Md. 564, 56 Atl. 813 (1904).

upon the guest to caution or warn the driver. In fact useless cautions and advice are more often harmful than otherwise."

We think the trial judge correctly withheld from the jury's consideration the issue of Phyllis' contributory negligence apart from the question of her failure to use the seat belt.

## II.

As stated in his brief, appellant's next contention is that the court "erred in not submitting to the jury the issue as to whether * * * [Phyllis] was *contributorily negligent* in not using the seat belts" provided by Cierpisz. (Emphasis supplied.)

Cierpisz directs our attention to the provisions of Code, Art. 66½, § 296 A, which follows:

"(a) Every motor vehicle registered in this State and manufactured or assembled after June 1, 1964, shall be equipped with two sets of seat belts on the front seat of the vehicle. It shall be unlawful to sell or offer for sale any vehicle in violation of this section.

"(b) For the purpose of this section only, 'motor vehicle' shall mean any vehicle intended for use as a private passenger vehicle and shall not include any motor bus, truck or taxicab.

"(c) For the purpose of this section only, 'seat belt' shall mean any belt, strap, harness or like device. No seat belt shall be sold or offered for sale for use in connection with the operation of a motor vehicle in this State after June 1, 1964, unless it meets the current standards and specifications of the Society of Automotive Engineers applicable to such belts. (1963, ch. 619)"

Although he concedes the statute "falls short of a directive or statutory requirement that seat belts be used" he argues it nevertheless indicates a legislative opinion that they are "a worthwhile safety device" and that failure to use them is "some evidence" of contributory negligence. In support of his argu-

ment he cites two decisions of the Wisconsin Circuit Court[2] construing a Wisconsin statute[3] similar to § 296 A. There was no appeal in either case. As will presently be shown, however, these decisions were overruled by *Bentzler v. Braun,* 149 N. W. 2d 626 (Wis. 1967).

The seat belt statutes present a curious situation. In Roethe, *Seat Belt Negligence in Automobile Accidents,* Wis. L. Rev., Vol. 1967, No. 1, p. 288 (1967) it is said there are 23 states which by statute require the installation of seat belts. All of them have been enacted since 1960. Except for a few states which make infractions of the statute a misdemeanor, no sanctions for violations are provided. No state requires the belts to be used after installation. Indeed, three states, Minnesota, Tennessee and Virginia, specify that failure to make use of the belts shall not be deemed negligence. The writer of the Wisconsin Law Review article concludes that a statutory standard of use by implication finds little support in the language of the statutes and their legislative histories. The limitation of the Maryland statute to the front seat of passenger vehicles and the complete exemption of busses, trucks and taxicabs appears to support such a conclusion.

In *Bentzler v. Braun, supra,* the Supreme Court of Wisconsin recently undertook a comprehensive examination of recent decisions and law review articles concerning seat belts, includ-

---

**2.** *Busick v Budner,* Cir. Ct. Milwaukee Co. (Wis. 1965); *Stockinger v. Dunisch,* Cir. Ct. Sheboygan Co. (Wis. 1964).

**3.** Sec. 347.48. "Safety Belts. (1) Safety Belts Required. It is unlawful for any person to buy, sell, lease, trade or transfer from or to Wisconsin residents at retail an automobile, which is manufactured or assembled commencing with the 1962 models, unless such vehicle is equipped with safety belts installed for use in the left front and right front seats thereof, and no such vehicle shall be operated in this state unless such belts remain installed.

"(2) Type and Manner of Installing. All such safety belts must be of a type and must be installed in a manner approved by the motor vehicle department. The department shall establish specifications and requirements for approved types of safety belts and attachments thereto. The department will accept, as approved, all seat belt installations and the belt and anchor meeting the society of automotive engineers' specifications."

ing the one mentioned above. In that case the plaintiff, Janet Bentzler, was a passenger in an automobile equipped with seat belts. Neither she nor the driver was using them when the accident happened. She sustained facial injuries, loss of teeth and other injuries. Because the language of the court in respect of the seat belt issue is singularly apposite to the instant case we have set forth several excerpts from the opinion:

"\* \* \* On this appeal both Braun and Bergstrom argue that the court erred in failing to instruct the jury in regard to plaintiff's use of seat belts. It is argued that the seat belt law, sec. 347.48, Stats., not only requires that cars be equipped with seat belts but that the failure to use them when available constitutes negligence. The statute requires the installation of seat belts but does not explicitly require that the seat belts be used after installation. A 1967 Wisconsin Law Review article discusses this question:

'\* \* \* a more probable alternative is that the statute does not require use by implication. A study of the legislative history of 347.48 does not indicate an implied purpose to require the use of seat belts. The purpose of chapter 521, Wisconsin laws of 1961, is to require "installation of safety belts in automobiles." 347.48 was amended in 1963 by chapter 448, Wisconsin laws of 1963. The purpose of this amendment related to "maintenance of seat belts after their installation." In neither case was use mentioned or considered as part of the statutory policy.

'\* \* \* it's certainly arguable that the purpose of the legislature was merely to make seat belts available for use and thus further develop and implement the seat belt safety campaign. This position becomes more tenable in view of the fact that safety belts are required only in automobile models of the year 1962 or later, and are required only in the front seats of an automobile. Thus, the statute does not appear to be an absolute safety measure. If the legislature was concerned with implementing the use of seat

belts, it seems plausible that belt installation would have been required for all cars in all seats.' Roethe, Seat Belt Negligence in Automobile Accidents [Winter 1967 Wisconsin Law Review, p. 290].

\* \* \*

"While we agree with those courts that have concluded that it is not negligence *per se* to fail to use seat belts where the only statutory standard is one that requires the installation of the seat belts in the vehicle, we nevertheless conclude that there is a duty, based on the common law standard of ordinary care, to use available seat belts independent of any statutory mandate.

"A recent publication has collected some of the statistics in regard to the effectiveness of seat belts. The publication, 'For the Defense,' dated February 1966, claims that, in a study of 79 fatal accidents, 34 percent of them would have been nonfatal if seat belts were used. A study by the San Diego, California, police department, which is referred to in the article, indicates that in a period when 282 motorists were injured and 8 killed:

'Seat belts would have *saved* five lives. They would have *prevented* 49% (139) of the injuries, *lessened* 21% (60), and lessened or prevented 9% (26). In 6% (14) they would have had an unknown effect, and no effect in 15% (43) of the cases.'

\* \* \*

"While it is apparent that these statistics cannot be used to predict the extent or gravity of injuries resulting from particular automobile accidents involving persons using seat belts as compared to those who are not using them, it is obvious that, on the average, persons using seat belts are less likely to sustain injury and, if injured, the injuries are likely to be less serious. On the basis of this experience, and as *a matter of common knowledge, an occupant of an automobile either knows or should know of the additional*

*safety factor produced by the use of seat belts.* A person riding in a vehicle driven by another is under the duty of exercising such care as an ordinarily prudent person would exercise under similar circumstances to avoid injury to himself. (Emphasis supplied.)

\* \* \*

"The question, therefore, is not whether the guest's negligence contributed to the cause of the accident but, rather, whether it contributed to the injuries. In view of the Wisconsin statutes that the legislative mandate in regard to seat belts applies merely to installation and not to use, the failure to use available seat belts is a question for determination by the jury as in the case of any ordinary negligence, i.e., was the conduct a substantial factor in producing a result.

"We therefore conclude that, in those cases where seat belts are available *and there is evidence before the jury indicating causal relationship between the injuries sustained and the failure to use seat belts, it is proper and necessary to instruct the jury in that regard.* A jury in such case could conclude that an occupant of an automobile is negligent in failing to use seat belts. In the instant case, however, because of the lack of any evidence of causation, the trial judge properly refused the requested instruction. There was proof that seat belts were available and were not used, but that fact alone does not prove causation, for the driver of the vehicle also failed to use the available seat belts, but his injuries were minimal." (Emphasis supplied.)

\* \* \*

"The only witness offered was an orthopedic surgeon, who, although qualified in his chosen profession, did not purport to be able to testify what effect the use of seat belts might have had in this particular case. The record supports the trial court's determination that there was no proof whatsoever to show that Janet Bentzler's injuries were caused or aggravated by the failure to use the seat belts. In the absence of credible evidence by one qualified to express the opinion of how

the use or nonuse of seat belts would have affected the particular injuries, it is improper for the court to permit the jury to speculate on the effect that seat belts would have had." *Id.* at 638-41.

See also *Kavanagh v. Butorac,* 221 N. E. 2d 824, 830 (Ind. 1966).

We do not adopt, at this time, the Wisconsin court's statement that "an occupant of an automobile either knows or should know of the additional safety factor produced by the use of seat belts." We are persuaded, for the present at least, that the following statement in Roethe, *Seat Belt Negligence in Automobile Accidents, supra,* is a more accurate appraisal of the status of seat belts in the "mind of the public:"

"* * * The social utility of seat belts and their use could easily be demonstrated by statistical data and reliance on the factual assumptions supported by this data as brought out earlier in this note. *Nonetheless, the issue of the social utility of the use of seat belts is definitely not clarified in the mind of the public and the courts. Doubts remain as to whether seat belts cause injury, and the real usefulness of the seat belt in preventing injuries has not become public knowledge." Id.* at 296. (Emphasis supplied.)

And again at 297:

"* * * However, the social utility of using a seat belt is not clear. In spite of the overwhelming scientific evidence supporting the beneficial results of seat belt use, acceptance of the safety belt by the public has not been achieved. *The social utility of wearing a seat belt must be established in the mind of the public before failure to use a seat belt can be held to be 'negligence. Otherwise the court would be imposing a standard of conduct rather than applying a standard accepted by society."* (Emphasis supplied.)

As Mr. Roethe points out, motoring on our highways is still a relatively safe and convenient method of travel. He cites re-

cent Wisconsin highway statistics as showing that one accident occurs for every 230,000 vehicle miles. We are told by the State Police that in 1966 there were 4.6 deaths caused by motor vehicle accidents for every 100 million miles of highway travel in Maryland.

We agree, as did the Wisconsin court, with the courts that have held it is not negligence per se to fail to use a seat belt where the statute requires only its installation in the vehicle and we so hold. We hold, also, that the failure to use the seat belt, standing alone, is not evidence sufficient to support a finding of contributory negligence. Some future case in which the availability of the belt will be known to the plaintiff and in which there will be evidence indicating the failure to use it was a substantial factor in producing or aggravating the plaintiff's injuries may require us to consider holding that the issue, with proper instructions, ought to be submitted to a jury. This case does not require it and we do not so hold.

No expert testimony was produced at the trial. There was no proof that Phyllis' injuries were either caused or aggravated by her failure to use the seat belt. She said she "was thrown up into the air," that her "forehead struck the rear view mirror and broke it" and that as she "came back down" she cut her face on the "dashboard where the glass had fallen." There was no showing that she would not have injured herself in the same manner if the seat belt had been fastened. Cierpisz was not injured despite the fact his belt was not fastened. In fact, he drove the car home after the accident. Moreover, it is at least doubtful whether she knew the safety belt was there. There is no evidence that Cierpisz suggested to her that she make use of it or that he made her aware of its presence by the simple act of fastening his own. She testified, of course, that the car had seat belts but her knowledge of that fact might well have been acquired after the accident. The same might be said of the reason she gave for not fastening the belt.

Since we think the trial judge was correct in refusing to allow the jury to indulge in speculation, which they would have been obliged to do in order to resolve the issue, the judgments will be affirmed.

*Judgments affirmed.*
*Appellant to pay the costs.*