(No. 6172—Claimant )

JAMES STEARMAN AND NOREEN STEARMAN, Claimants, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed June 24, 1974.*

LEWIS, BLICKHAN & GARRISON, Attorney for Claimant.

WILLIAM J. SCOTT, Attorney General; WILLIAM E. WEBBER, Assistant Attorney General, for Respondent.

BURKS, J.

This action, sounding in tort, seeks damages for personal injuries suffered by the claimants, husband and wife, allegedly caused by the respondent's negligence in failing to warn the claimants of the suspended position of a highway drawbridge spanning the Illinois River at Florence.

This drawbridge, under the jurisdiction and control of the respondent, was constructed so that it would raise to allow river traffic to pass underneath. At both ends of the bridge there were warning lights and barricade gates to stop traffic when the bridge was suspended. The bridge and warning systems were operated by electrical power. In case of a power failure, emergency auxilliary power was available to operate both the bridge and the warning systems.

Several hours before claimants' accident occurred at 5:00 A.M. on February 22, 1971, there was a power failure in the usual source of power at the bridge, and, at the time of the accident, the bridge was being operated temporarily on its auxilliary power. This emergency arrangement required the bridge tender to turn on the warning lights and to lower the gates manually, when the bridge was being raised.

The bridge tender, respondent's employee, admits that he forgot to turn on the warning lights and lower the barricades before he proceeded to raise the bridge just prior to claimants' accident.

It was a dark rainy foggy morning when claimants approached the bridge, eastbound on U.S. Route 54, driving their 1963 model family car returning home from a vacation trip. Since there were no warning lights or barricades at the end of the bridge, claimants proceeded towards the bridge not knowing that it had been elevated

some 19 inches above the road surface. Claimants' automobile was only about four car lengths from the elevated section when the driver, Mr. Stearman, noticed the obstruction. It was then impossible to prevent the car from coming into a collision with the exposed end of the elevated bridge. As a result of the collision, both claimants were seriously injured. These facts are not in dispute.

Respondent concedes that its negligence in failing to activate the warning system before starting to raise the drawbridge was the proximate cause of claimants' accident.

Respondent suggests that claimants were contributorily negligent in failing to have their 1963 model car equipped with seat belts and in not using seat belts at the time of the accident. Respondent cites *Ill.Rev.Stat. 1969, Ch. 95½, §12-603(b)* which states:

"No person shall operate any 1961 or later model motor vehicle of the first division that is titled or licensed by the Secretary of State unless the front seat of such motor vehicle is equipped with 2 sets of seat safety belts."

Claimants effectively answer this point by the facts that, at the time of the accident, they were residents of 233 Carroll Street, Hammond, Indiana, and were driving a 1963 Ford with Indiana registration number 4SW5986. Since their automobile was not "licensed or titled by the Secretary of State", that statute cited above does not apply to the claimants and is therefore not relevant.

Although it is clear that the claimants were under no statutory duty to have their car equipped with seat belts, we have carefully examined the questions, thoroughly presented in respondent's brief, as to whether they were under a duty to have and to use seat belts under the common law standard of ordinary care.

It appears that there have been 4 cases on this subject considered by the reviewing courts of this state:

*Mount* v. *McClellan,* 91 Ill.App.2d 1 (1968)
*Hulsebus* v. *Russian,* 118 Ill.App.2d 174 (1968)
*Schomer* v. *Madigan,* 120 Ill.App.2d 107 (1970)
*Hale* v. *Cravens,* 129 Ill.App.2d 466 (1970)

Each of these decisions have refined the rules on the issue before us concerning seat belts, and this court will follow the rule expressed in the Appellate Court's most recent announcement in the case of *Hale* v. *Cravens* (Supra) where the court said at page 477:

"We adhere to the view expressed in *Schomer* that neither the existence nor the use of seat belts has any relation to the issue of liability, and that an instruction as to the existence or nonexistence, use or nonuse of a seat belt would be proper with reference to damages only when the record establishes by competent evidence that the damages may have been mitigated if a seat belt had been in existence and used."

Under the above rule, respondent concedes that claimants' failure to have or to use seat belts is not contributory negligence that would excuse the state's liability, but properly insists that this fact be considered by the court on the question of mitigation of damages. Respondent's point is that claimants' injuries would probably have been less serious if, in the exercise of ordinary care, they had been using seat belts. This position finds support in the first case on the subject considered by the Appellate Court, *Mount* v. *McClellan* (Supra). But the court also said in *Mount* at page 5: "The jury may give great or small weight to it, but in gur judgment they

We are subsequently admonished in *Hale* v. *Cravens* (Supra), at page 477, that the non-use of seat belts may properly be considered "with reference to damages only when the record establishes by competent evidence that the damages may have been mitigated if a seat belt had been used."

Looking to the record here for evidence to satisfy the *Hale* test, we find that the respondent did elicit, on cross examination of claimants' attending physician, a competent professional opinion that "it is possible, certainly," that claimants' injuries may have been less serious if they had been restrained by seat belts. Although claimants characterize this opinion of their own doctor as "mere conjecture or speculation", we believe it must be properly considered by this court, under the rule in *Mount* and *Hale*, in determining the sums to be awarded to claimants in damages.

Before turning to the questions of damages, we acknowledge a 1960 opinion of this court which claimants cite as being directly in point, *Armour & Co.* v. *State*, 24 C.C.R. 170. In that case we granted an award for claimant's total property damages in an accident on a drawbridge. As in the case at bar, the accident was caused by the bridge tender's negligent failure to give timely warning that the bridge was raising.

There were no personal injuries in the *Armour* case and, of course, no issue involving seat belts. We must here consider for the first time in this court the rule that claimants' failure to use seat belts may be a mitigating factor in assessing the amount of damages for the severe injuries suffered by both claimants.

After the accident, the claimants were removed from their automobile and taken to the Illini Hospital in Pittsfield for emergency treatment. From there they were transferred to Blessing Hospital in Quincy.

Claimant, James Stearman, receiving numerous cuts and bruises and sustained steering wheel trauma to the abdomen. He also suffered a compound fracture of the left tibia lower portion and a large laceration of the

leg at the side of the fracture. He also sustained a dislocation of the right foot at the tarsometatarsal joint, with considerable displacement. These injuries required surgery, and this claimant was hospitalized for approximately three months. When James Stearman was released from the hospital, his legs were in a cast for approximately two months. As a result of the accident and the hospitalization, he sustained the following financial damages:

1. Loss of wages for 24 weeks at $225.00 . . . . . . . . . . . . . . $ 5,400.00
2. Blessing Hospital bill . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,348.10
3. Doctor bill, Quincy Clinic. . . . . . . . . . . . . . . . . . . . . . . . 1,325.50
4. Gem City Orthopedic Appliance . . . . . . . . . . . . . . . . . . . . 35.00
5. Emergency treatment, Dr. Rodriguez . . . . . . . . . . . . . . . 50.00
6. Property damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 125.00

Total damages excluding pain and suffering
and permanent injury . . . . . . . . . . . . . . . . . . . . . . . . . $11,283.60

The extent of James Stearman's injuries is set forth in claimants' numerous medical exhibits, and the extent of his permanent disability was testified to by Dr. Don K. Gilchrist. Dr. Gilchrist testified that this claimant had experienced pain and suffering and would suffer additional pain in the future. Dr. Gilchrist further testified that, at the present time, there appears to be evidence of traumatic arthritis, protruded and dislocated bone in the area of the right foot. This has caused the foot to become flat, and this condition will be permanent. The doctor further stated that this condition would cause difficulty in walking and would cause Mr. Stearman discomfort and pain in the future. Mr. Stearman has now returned to his former employment as a truck driver. However, the doctor testified that the claimant was having some pain in using his foot, which is a handicap in this type of employment, and that this could give him additional difficulty in the future. The doctor further testified that the fractured left leg had caused this claimant pain and

suffering, would in the future continue to cause him difficulty, and that his condition was of a permanent nature.

Claimant, Noreen Stearman, was more severely and permanently injured than her husband. As a result of the accident, she sustained the following injuries: (1) Fracture, closed, commuted supracondylar area, right humerus; (2) Fracture, closed, commuted, right femur, enter and subtrochanteric area; (3) Fracture of the third, fourth, fifth, sixth, seventh, and eighth ribs; (4) Fracture of the superior and inferior pubic rami; (5) Contusion, left lung; (6) Fracture, compound, comminuted mandible and maxilla; (7) Lacerations, lip, chin, and right thigh; (8) Cerebral concussion; (9) Hypodolemic shock; (10) Osteomyelitis mandible. (11) Palsy, motor division, right ulner nerve.

As a result of these injuries, claimant, Noreen Stearman, suffered the following special damages:

| | | |
|---|---|---:|
| 1. | Blessing Hospital | $14,399.70 |
| 2. | Blessing Hospital, therapeutic care | 130.00 |
| 3. | Dr. Fred E. Cory, dental services | 430.00 |
| 4. | Dr. Benigno J. Rodriguez | 50.00 |
| 5. | Dr. Felix M. Martin | 380.00 |
| 6. | Dr. Steve Farantzos | 1,819.00 |
| 7. | Quincy Clinic | 1,370.50 |

Total, excluding pain and suffering and permanent disability .......................... $18,579.20

The injuries and treatment that Noreen Stearman received are contained in the testimony of Dr. Gilchrist and Dr. Farantzos. The fact that this claimant lived apparently is a credit to the attending physicians.

As a result of her multiple injuries, Noreen Stearman sustained permanent scarring in and about her face, arm and body. She has limited use of an arm, wrist and hand. She has limited use of her hip and leg. She has one

leg shorter than the other and is forced to wear a raised shoe. Dr. Don K. Gilchrist testified that she experienced considerable pain and suffering and would be expected to suffer additional pain in the future. The doctor further testified that the condition of her arm, leg and hip are permanent, and that she has suffered permanent partial disability.

At the hearing on May 25, 1972, claimant, Noreen Stearman, testified that her jaws are wired; that she is unable to bathe herself or to dress herself; that she is unable to do her normal housework or to stand for any extended periods of time. She has fallen on different occasions and cannot get back up; she cannot iron, swim or bowl or carry on the normal functions to which she was accustomed.

The court takes notice that, on the date of claimants' accident, *§8(d) of the Court of Claims Act* provided that "an award for damages in a case sounding in tort shall not exceed the sum of $25,000 to or for the benefit of any claimant". In oral argument heard by the court on May 14, 1974, counsel for the claimants emphasized the fact that, if you combine the two claimants' total loss for their extensive medical services and loss of wages, it amounts to $29,862.80, which is exclusive of any damages for their pain, suffering and permanent injuries. Counsel concludes that, if there ever were two individuals entitled to the maximum award of $50,000, these claimants must be the ones.

The court cannot legally combine the special losses and permanent injuries of these 2 claimants to justify a total award in excess of the statutory limit for each claimant. We must regard the claims of Mr. and Mrs. Stearman as two separate and independent claims.

501

We are also under a duty to consider the failure of claimants to use seat belts as a factor that could mitigate the amount of damages.

In the first case considered by the Illinois Appellate Court, *Mount* v. *McClellan* (Supra), dealing with the question as to whether evidence of the existence or use of seat belts is admissable as a factor in determining the common-law duty of care, the court examined cases in other jurisdictions. It noted that in Delaware and Florida such evidence is not admissable. However, the court said, "It seems to us that the better reasoning favors the admissability of the evidence". Citing Indiana, South Carolina and Wisconsin as states which hold this view, the court quoted the following statements from *Bentzler* v. *Braun*, 34 Wis.2d 362 (1967):

"There is a duty, based on the common-law standard of ordinary care, to use available seat belts independent of any statutory mandate."

"It is obvious that, on the average, persons using seat belts are less likely to sustain injury and, if injured, the injuries are likely to be less serious. On the basis of this experience, and as a matter of common knowledge, an occupant of an automobile either knows or should know of the additional safety factor produced by the use of seat belts."

Admittedly, *Mount* gives the court a wide latitude of discretion when it says that the trier of facts [court or jury] may give "great or small weight to it", but they should consider the matter. In this case we could give the matter a more meaningful consideration if the evidence had been more explicit as to which of the injuries suffered by the claimants might have been avoided, or less severe, if they had been using seat belts. For example, the court has no way of knowing whether the "steering wheel trauma to the abdomen" which Mr. Stearman sustained was any more or less severe than "seat belt trauma" might have been if he had been using a seat belt.

As this record stands, the court must base its judgment on mere "possibilities" and the generally accepted view that the use of seat belts does generally tend to minimize injuries in most cases.

In the claim of Noreen Stearman, who had special damages for medical care totaling $18,579.20, we find that she also suffered permanent injuries so severe that the maximum award of $25,000 is fully justified, notwithstanding any amount that might reasonably be deducted in mitigation pursuant to the rules in *Mount* and *Hale*.

In the claim of James Stearman, whose special damages for medical care and loss of wages totaled $11,283.60, we believe that the severity of his injuries would not justify a total award in excess of the statutory amount even if we were not required to assume that his injuries would have been less severe if he had been using seat belts. Giving a small amount of weight to this assumption in mitigation of his damages, as we are "entitled" to do under the rule of *Mount*, we believe that a total award to Mr. Stearman in the sum of $20,000 is fair and reasonable. The court hereby awards damages to the claimants as follows:

To the claimant, James Stearman, the sum of $20,000.

To the claimant, Noreen Stearman, the sum of $25,000.