No. 14810

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

ROSE KOPISCHKE,

Plaintiff and Respondent,

vs.

FIRST CONTINENTAL CORPORATION,

Defendant and Appellant.

---

Appeal from: District Court of the Eighth Judicial District,
Honorable H. William Coder, Judge presiding.

Counsel of Record:

For Appellant:

Robert Emmons argued, Great Falls, Montana

For Respondent:

Hoyt, Triewiler, Lewis and Regnier, Great Falls, Montana
John Hoyt argued, Great Falls, Montana

Submitted: December 13, 1979

Decided: MAR 13 1980

Filed: MAR 1 1980

_Thomas J. Kearney_
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal from judgment after a jury verdict in the District Court of the Eighth Judicial District, County of Cascade, in a negligence action.

The complaint herein consisted of three counts. Count III of the complaint, a claim predicated upon strict liability of the defendant, was dismissed by defense motion prior to trial. The remaining counts were submitted to the jury on special verdict, and the jury returned a verdict involving comparative negligence. Defendant was found to be 65 percent negligent and plaintiff was found to be 35 percent negligent. Total damages were assessed by the jury at $650,000, and the court entered judgment for plaintiff in the sum of $422,500.

Defendant moved for a new trial after judgment was rendered, but the motion was denied. From the final judgment and denial of the motion for a new trial, defendant appeals. Plaintiff cross-appeals.

Defendant, a used car dealer, sold a used car to plaintiff and her husband in late December, 1976. The car in question, a 1971 Datsun station wagon, was purchased through one of defendant's salesmen after a short test drive, during which the car pulled slightly to the left.

Additionally, plaintiff informed the salesman of several minor things she had noticed that were wrong with the car. Some of these were that the horn did not work, poor tires, a wire hanging out of a rear taillight assembly, and that the car pulled to the left. The sales invoice listed that a number of these corrections were to be made.

The salesman also advised plaintiff that they would take the tires off another 1971 Datsun and put them on plaintiff's car.

-2-

The sales invoice indicated an odometer reading of 83,615 miles and a disclaimer in fine print that read: "All used cars are sold on an as is basis with no guarantee either express or implied except as noted above." Above this disclaimer was set forth the aim of defendant: "To serve you courteously, completely and honestly. To profit, not only in money, but in the good will and friendship of our customers. To improve whenever possible and correct our errors when we learn of them. To do our best every day, in every way, to build an establishment which will be known as the finest in our field."

No explanation was given to plaintiff pertaining to the "as is" clause.

The 1971 Datsun had a somewhat checkered history. The car was purchased new in 1971 by a couple who lived in San Diego, California. They traded the car in to Melody Toyota, Inc., in 1975. At the time of the trade-in, the car's odometer registered 85,106.4 miles. However, the car was described to be "in very good mechanical condition." Through an unknown series of events, the car was acquired by Swanson Sales in California and resold in California to Pierotti Motors. At the time the car was purchased from Swanson by Pierotti, the odometer had been turned back to 41,194 miles.

Pierotti sold the car to a Robert Graff in July 1975. Graff owned the car until it was repossessed in 1976 by Credit Associates.

Graff testified that the car was not involved in any accidents and that there was nothing wrong with the car, except for the tires being in fair condition. However, he also testified that at times he noticed vibration in the steering.

A representative of Credit Associates testified that the Datsun was dirty, junky and dented, that the engine needed a tuneup, and the springs and shocks were shot.

The car was put out for bids and sold to defendant. Neither plaintiff, nor defendant's salesman, knew that the car was repossessed or that the odometer reading was incorrect. Plaintiff testified that had she known the car had over 120,000 miles on it, she would not have bought it.

Plaintiff took delivery of the car on December 27, 1976, had a C.B. radio installed, and drove it to Missoula a few days later. She experienced vibration in the car and a pulling to the left, but had no real trouble on this trip. She did, however, consult a mechanic about the car, and on two occasions repair work was done. This work involved a tuneup, fixing the speedometer, installing a heater, fixing the brakes, aligning the front-end, etc. On the last occasion, the mechanic recommended on a repair order, "Take the car back, needs lots of work, not safe on the road." Plaintiff testified that she thought this meant she was to bring the car back for repairs and that she did not think she would be in any danger if she drove the car, except maybe she could be stranded if the car broke down.

Plaintiff drove the car around Missoula until January 21, 1977, when she drove it back to Great Falls. She again experienced shaking and vibration in the car during this trip. On arrival in Great Falls, plaintiff called Dave Fender, one of defendant's salesman, about the problem and was advised that the car was merely "dieseling" and that premium gas would correct the problem.

The following day, January 22, 1977, plaintiff drove to Chester for an appointment with her doctor. Her husband

told her she should probably take the couple's other car, but she thought she could use her C.B. and get assistance if she had any problems. Plaintiff testified it was a good day for driving, the roads were excellent, and the car handled fine on the way to Chester and all the way back to the point of the accident.

The accident occurred a few miles west of Carter on a good stretch of highway. The car suddenly started to vibrate, and the steering wheel and motor began shaking. The car went out of control, veered into the left lane, swung back to the right, went off the road and rolled over.

Plaintiff was thrown out of the car and sustained severe back injuries, which have left her paraplegic. A driver in the car following plaintiff's testified she was driving prudently and at about 50 m.p.h. just before the accident.

There is no question that plaintiff was not using the safety belt in her car at the time of the accident.

Raymond McHenry, a consulting engineer, was retained by plaintiff to determine the cause of the accident. McHenry examined the car, viewed the accident scene and discussed the accident with plaintiff. In addition, he removed the wheels, MacPherson struts, and carefully examined the vehicle to determine what caused it to go out of control.

McHenry examined the transverse link (lower control arm) on the right front suspension and found that it was cracked extensively, bent and had four compression marks on it, indicating that the bend had been caused by a tool. He also found that there were four white sidewall tires on the car. All of the white sidewalls turned outward in the normal manner except the right front white sidewall, which

was reversed with the white sidewall turned inward. On the white side of that tire there was a tread separation several inches in length, and this tire was out of balance. In addition, McHenry found that the left side motor mount was completely separated and sitting in an unusual position, the stabilizer bar was disconnected, and the left rear brake lining showed lubricant on it which had been leaking since before plaintiff purchased the car.

McHenry performed various tests on a Datsun similar to plaintiff's, using bent transverse links, disconnected stabilizer bar and disconnected left rear brake to determine the effect on the car's handling. He also consulted with Dr. James Magor, a metallurgic engineer at North Carolina State University, who ran various tests on the transverse link. He concluded the transverse link had been deliberately bent to an angle of 30° and then straightened to an angle of 20° and, in straightening this link, cracks were formed. These cracks extended under the alternating loading conditions of plaintiff's car in a process called metal fatigue.

McHenry reconstructed the cause of the accident as follows: Prior to the accident the transverse link had deliberately been bent to an angle considerably greater than 10° and then reverse bent to an angle of approximately 10°. (Dr. Magor established with certainty that this had been done a long time prior to the acquisition of the car by plaintiff.) Through the process of metal fatigue, the transverse link had progressively weakened as the cracks propagated through the upper section and down the sides of the link. The smaller bend in the link or arm had already created a mild pull to the left.

Due to the process of metal fatigue, just prior to the accident the transverse link bent more, causing the wheel to toe-in. The vibration which plaintiff described served to accelerate the fatigue process causing the cracks to propagate in an accelerated manner which, superimposed upon the already weakened link, abruptly increased the angle of bend from 10° or less to approximately 20°. This occurred in approximately one second and resulted in a heavy pull to the left causing the vehicle to go into the lane for oncoming traffic.

The vibration or shimmy was caused by the unbalanced retread tires. With the tread separation on the right front and two inches of free play at the rim of the steering wheel and the MacPherson struts low on dampening fluid, the vibration occurred. In addition, the disconnected motor mount would allow the engine vibration to reach a larger amplitude therefore shaking the engine more. McHenry completely ruled out driver error.

The reason the car veered to the right was because of steering input by plaintiff.

With the right front stabilizer bar disconnected, the car veered farther to the right, causing it to face the direction it was traveling at the time it came to the shoulder of the road and then to roll over.

In test runs with a similar test car of the same make, it took 1.4 seconds for the test car traveling 50 m.p.h. with a 20° bend in the transverse link to go entirely into the opposite lane. The bend now seen in the plaintiff's transverse link is 20°. In addition to the effort to hold the steering wheel straight on the test car at 50 m.p.h. with a 20° bend in the transverse link, the steering wheel

had to be turned 60° to the right just to hold the car in a straight line.

Testimony indicated that defendant did not inspect plaintiff's car for defects after it was acquired at the repossession sale. Testimony of defendant's employees indicated that a 5° bend in the transverse link would have been obvious if the car were placed on a hoist or if a front-end alignment check were made. (Defendant did not require safety inspections on used cars.) However, one employee testified that it was normal for every used car to receive an inspection by being lifted on a hoist where a mechanic would inspect the undercarriage for defects.

Defendant's owner, John Greytak, testified that at one time there was a multi-point inspection which included an undercarriage inspection but that this was discontinued in 1974. When Greytak was questioned by plaintiff concerning whether defendant offered used cars for sale to a customer with the representation that they had been checked from end to end, he testified that they would not advertise in that manner or use those words. After much objection, an advertisement published by Great Falls radio station KEIN after the accident was admitted which stated:

> "You really can't tell a heck of a lot about a used car by kicking the front tires. So at Continental Datsun-Volvo before a used car is offered for sale, we check the compression, front end alignment, inspect the brake lining, test the brakes, check the front end and shocks, test the automatic transmission, safety test the lights, horn, turn signals and wipers. Plus they change the oil and filter, they give it a grease job and a full reconditioning. So when you kick the tires on a used car at Continental, you're kicking the tires of a darn good car, one that's been checked and corrected from end to end. Continental Datsun-Volvo."

-8-

It is undisputed that no safety inspection was done on plaintiff's car by defendant. The testimony indicated that defendant's manager and salesmen intended their customers to assume that they were buying a reliable car, one that was safe for highway use.

Over thirty issues were presented for review on this appeal. A number of these issues were consolidated by counsel in general headings. We will therefore discuss the issues in a consolidated form.

There are five major issues, the resolution of which determines the outcome of this appeal. They are:

1. Did the District Court err in instructing the jury that a used car dealer has a legal duty to inspect and discover any defects in a used car which would have been discoverable in the exercise of ordinary care and then to either repair such defects or at least warn a buyer of their existence?

(a) What effect does the "as is" clause have on such a duty?

(b) Did the District Court err in refusing to permit testimony, argument, or instructions on the "as is" clause contained in the purchase agreement?

2. Did the District Court err in refusing to present to the jury the question whether plaintiff's failure to use seat belts contributed to her injuries?

3. Did the District Court err in refusing to give instructions on plaintiff's alleged contractual and non-contractual assumptions of risk?

4. Did the District Court err in denying defendant's motion for summary judgment on plaintiff's Count II.

5. Was it error to refuse to allow the reading of plaintiff's deposition?

The key issue in this case is whether defendant had a legal duty to inspect and discover any defects in the used car which were obvious or discoverable upon reasonable inspection, and then to repair such defects or at least warn a buyer of their existence. Tied in closely with this issue is what effect the "as is" provision in the purchase agreement had on this duty.

Defendant contends that its duty was defined by the contract--"it was to sell the car in question, nothing more." It further submits that the term "as is" has a definite meaning in the law. It implies that the buyer is taking delivery of goods in some way defective and upon express condition that he must trust to his own examination. Black's Law Dictionary (4th ed. rev. 1968) at 146; 6A C.J.S. As Is at 299.

From this premise defendant concludes that if a vehicle is sold by a used car dealer "as is", the dealer is not liable to the buyer in negligence for injuries traceable to defects in the vehicle. Thrash v. U-Drive-It Co. (1953), 158 Ohio St. 465, 110 N.E.2d 419, 423; Pokrajac v. Wade Motors (1954), 266 Wisc. 398, 63 N.W.2d 720. Defendant argues it was error for the District Court to expressly direct the jury not to consider the "as is" provision. Defendant states that this, in effect, constitutes a re-writing of the agreement--something the District Court is not permitted to do. Section 1-4-101, MCA; Danielson v. Danielson (1977), 172 Mont. 55, 560 P.2d 893.

Plaintiff contends that defendant was negligent as a matter of law. This contention is based on defendant's

failure to inspect and on defendant's knowingly placing a damaged front tire on plaintiff's car. Plaintiff argues that a person cannot contract away liability because to do so would contravene public policy. Haynes v. County of Missoula (1973), 163 Mont. 270, 517 P.2d 370. Therefore, the "as is" provision is ineffective to protect defendant from liability for its negligent acts.

Plaintiff also cites Turner v. International Harvester Company (1975), 133 N.J.Super. 277, 336 A.2d 62, for the proposition that an "as is" disclaimer in the sale of a used vehicle does not bar a negligence action.

Defendant, in its reply brief, distinguishes Haynes and argues that Haynes dealt only with contracting away possible future negligence while this case, of necessity, involves past negligence.

The general rule in Montana is that a used car dealer has a duty to discover and repair any defects which are patent or discoverable in the exercise of ordinary care. Rogers v. Hilger Chevrolet Company (1970), 155 Mont. 1, 465 P.2d 834. In Hilger, however, the defendant was not held liable because the evidence indicated that "[d]efendant did not warn plaintiff of any defects because it is obvious from the record defendant did not have any knowledge of a defect. Defendant's employees checked the automobile over and this check included the right front door. Defendant's duty does not extend to completely dismantling an automobile and then reassembling it before its resale." Hilger, 465 P.2d at 838. The evidence here shows that the defect was an obvious one and a reasonable inspection would have revealed it. In the instant case, however, defendant concedes that no inspection took place. In fact, defendant contends there was no duty to inspect.

There is also the added factor in this case of defendant's "active negligence" in replacing worn tires with three good tires and a defective one. The act of placing the white sidewall on the inside was apparently a means of purposefully hiding from plaintiff a defect which inevitably accelerated the breakdown of the transverse link.

In deciding Hilger this Court cited the Eighth Circuit case of Egan Chevrolet Co. v. Bruner (8th Cir. 1939), 102 F.2d 373. In Egan Chevrolet the court was presented with a similar fact situation in that the steering mechanism of the truck broke down, causing a collision. The court held for the plaintiff and stated:

> "A retail dealer who takes a used truck in trade and undertakes to repair and recondition it for resale for use upon the public highways owes a duty to the public to use reasonable care in the making of tests for the purpose of detecting defects which would make the truck a menace to those who might use it or come in contact with it and in making the repairs necessary to render the truck reasonably safe for use upon the public highways, and is charged with knowledge of defects which are patent or discoverable in the exercise of ordinary care. . . The rule does not mean—as the appellant seems to fear—that a dealer in used motor vehicles, who undertakes to recondition a truck for resale, becomes virtually an insurer of the safety of the truck he sells, nor does it mean that he is required to disassemble an entire truck to examine each of its parts. It does mean that he must use reasonable care to ascertain whether the truck is equipped with the minimum essentials for safe operation, one of which unquestionably is a steering mechanism which will work and which will not shortly shake apart under normal use. One who permits a truck with a dangerously defective steering mechanism to be used upon the public highways, not only has reason to anticipate that it will cause an accident, but may be almost certain that it will do so. 'In such circumstances, the presence of a known danger, attendant upon a known use, makes vigilance a duty.' . . ." 102 F.2d at 375-76. (Citations omitted.)

In accord with the above are Gaidry Motors v. Brannon (Ky. 1953), 268 S.W.2d 627 and Turner v. International

Harvester Company (1975), 133 N.J.Super. 277, 336 A.2d at 62.

> "It is common knowledge that old cars are more likely to be subject to mechanical defects than are new ones. The turnover in ownership of used cars is fairly rapid, and the majority of these cars are sold through used car dealers. The used car dealer is in a better position, by reason of his opportunity, than his average customer to discover what defects might exist in any particular car to make it a menace to the public. We are of the opinion it is not too harsh a rule to require these dealers to use reasonable care in inspecting used cars before resale to discover these defects, which the customer often cannot discover until too late." Gaidry Motors v. Brannon, 268 S.W.2d at 628-629.

Further,

> ". . . expectations of quality and durability will be lower for used goods, commensurate with their age, appearance and price. However, safety of the general public demands that when a used motor vehicle, for example, is sold for use as a serviceable motor vehicle (and not as junk parts), absent special circumstances, the seller be responsible for safety defects whether known or unknown at time of sale, present while the machine was under his control. Otherwise, the buyer and the general public are bearing the enterprise liability stemming from introduction of the dangerously defective used vehicle onto the public highways. Public policy demands that the buyer receive a used chattel safe for the purpose intended (where no substantial change will occur prior to reaching the buyer or forseeable consumer). . ." Turner v. International Harvester Company, 336 A.2d at 69. (Citations omitted.)

See also Ikerd v. Lapworth (7th Cir. 1970), 435 F.2d 197; Thrash v. U-Drive-It Co., supra; 60 C.J.S. Motor Vehicles §§165(7)-166 at 945-49.

Defendant cites Thrash for the proposition that use of an "as is" clause protects a used car dealer from liability for negligence for injuries traceable to defects in the vehicle.

A careful reading of Thrash shows that defendant has misread the case. It in fact points the finger of liability

at defendant.   Thrash involved the sale of a used truck "as is" from the U-Drive-It Company to the Spot Motor Company and then a subsequent sale from Spot to Thrash.   Shortly after the sale a lock ring on the left front wheel of the truck blew off, causing an accident in which the plaintiff was crushed.

The plaintiff sued both car dealers.   The court ruled that the U-Drive-It Company was not liable for the plaintiff's injuries because the sale to Spot Motor was an intervening factor relieving it from liability and transferring its duty to Spot.   The court stated:

> "We conclude that where the owner of a used motor vehicle sells the same 'as is' to a dealer in those articles for such disposition as the dealer may make of it, such owner may not ordinarily be held liable for injuries occasioned to one who purchased the vehicle from the dealer or for injuries to another, because of faults or imperfections in the vehicle which existed or occurred during the time it was in the possession of such owner."   Thrash, 110 N.E.2d at 423.

The court, however, ruled in effect that Spot Motor's negligence was still at issue and stated:

> "Although a dealer in used motor vehicles is not an insurer of the safety of the vehicles he sells, he is generally under a duty to exercise reasonable care in making an examination thereof to discover defects therein which would make them dangerous to users or to those who might come in contact with them, and upon discovery to correct those defects or at least give warning to the purchaser . . ."   Thrash, 110 N.E.2d at 423.
> (Citations omitted.)

It is the second ruling by the court, and not the first, which is applicable here as this case does not involve a sale between dealers but between a dealer and a consumer.   Once it has been determined that a used car dealer has a duty to reasonably inspect and discover defects which are patent or discoverable in the exercise of ordinary care and then to repair those defects,   Rogers v. Hilger

-14-

Chevrolet Company, supra, it becomes necessary to determine what effect the "as is" clause has on such a duty.

The phrase "as is" is a statutorily approved method of excluding warranties. The controlling statute is section 30-2-316(3)(a), MCA, which provides:

> "(3) Notwithstanding subsection (2):

> "(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is', 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty;"

The code comment on this section is of little help here. It states:

> "Paragraph (a) of subsection (3) deals with general terms such as 'as is,' 'as they stand,' 'with all faults,' and the like. Such terms in ordinary commercial usage are understood to mean that the buyer takes the entire risk as to quality of the goods involved . . ." U.C.C. (U.L.A.) §2-316.

The area of the code in which this section is located deals with exclusion or modification of warranties, express or implied, in sales of goods. These warranties for the most part deal with quality, merchantability, and fitness of the goods sold. There is nothing enumerated in these sections which deals with exclusion of tort liability. It would indeed be inconsistent if the disclaimer had that effect. This is especially the case in light of the legislature's passage of section 30-2-719(3), MCA, which provides:

> "(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

Montana subscribes to the general rule:

> "'. . . that persons may not contract against the effect of their own negligence and that agreements which attempt to do so are invalid. However,

it is not true that any agreement of this kind is void as against public policy. Whether a person can relieve himself by agreement from the duties attaching as a matter of law to a legal relationship created by contract between himself and another person, is a matter of some difficulty. The conclusion has been reached that even under the view that a person may, under some circumstances, contract against the performance of such duties, he cannot do so where either (1) the interest of the public requires the performance of such duties, or (2) because the parties do not stand upon a footing of equality, the weaker party is compelled to submit to the stipulation.'" Haynes v. County of Missoula (1973), 163 Mont. 270, 517 P.2d 370, 376.

One of the issues presented for review in Haynes was the propriety of the District Court's pretrial order suppressing the plaintiff's general release in the Western Montana Fair Entry Blank. The defendants argued the release was a valid and enforceable contract absolving the defendants from liability. The release provided: "I hereby release the Missoula County Fair Board from any liability by loss, damage or injury to livestock or other property, while said property is on the Fairgrounds." 517 P.2d at 376. This Court held the District Court was correct in suppressing the release stating, ". . . [i]n our view the release is illegal and unenforceable because it is contrary to the public policy of this state and against the public interest." 517 P.2d at 376.

We further stated in Haynes:

"Directing our attention to Montana law, we note an express public policy of this state to fix responsibility for damage to person or property upon those who fail to exercise ordinary care or skill. Section 58-607, R.C.M. 1947 [now section 27-1-701, MCA], provides:

"'Every one is responsible, not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, except so far as the latter has, willfully or by want of ordinary care, brought the

-16-

injury upon himself.  The extent of liability in such cases is defined by the title on compensatory relief.'

"The purpose of this statute is twofold:  (1) To fix primary responsibility and liability on the tortfeasor whose conduct occasioned the loss or injury, and (2) to make the victim whole.

"Section 13-1801(2), R.C.M. 1947 [now section 28-2-701, MCA], defines illegal contracts as those:

"'Contrary to the policy of express law, though not expressly prohibited.'

"Section 49-105, R.C.M. 1947 [now section 1-3-204, MCA], provides: 'Any one may waive the advantage of a law intended solely for his benefit.  But a law established for a public reason cannot be contravened by a private agreement.'

".  .  .

"We hold the County is precluded from disclaiming liability by virtue of the release when performing an act in the public interest.  This principle is recognized in Restatement, Contracts, § 575, providing in pertinent part:

"'(1) A bargain for exemption from liability for the consequences * * * of negligence is illegal if

"'(a) * * *

"'(b) one of the parties is charged with a duty of public service, and the bargain relates to negligence in the performance of any part of its duty to the public, for which it has received or been promised compensation.'"  Haynes, 517 P.2d at 376-78.

While Haynes dealt with a release of liability for future negligence, there is no reason the rules enumerated in Haynes should not apply here.  Defendant was under a duty to reasonably inspect for defects.  It failed to do so.  To allow it to disclaim liability by a simple "as is" phrase would be a violation of the public policy espoused in Haynes.

Montana has never determined what effect the "as is" phrase has on tort liability.  Other jurisdictions have interpreted the phrase, with varying results.  Defendant

urges this Court to follow the holding in Pokrajac v. Wade

Motors, supra. The court in Pokrajac held that the seller

was not liable for defects due to the existence of a dis-

claimer clause.

The disclaimer in Pokrajac, however, is different from

the one used in the instant case. It provided:

> "' * * * In case the car covered by this order is
> a used car, the undersigned purchaser states that
> he has examined it, is familiar with its condi-
> tion, is buying it as a used car, as-is, and with
> no guaranty as to condition, model or mileage,
> unless otherwise specified herein in writing.
> No oral representations have been made to the
> Purchaser and all terms of the agreement are
> printed or written herein * * *'" 63 N.W.2d at
> 721.

The court specifically found no duty to inspect or

repair because of the "as-is" clause. Further, it could

find no reason in public policy to prevent such a dis-

claimer.

Pokrajac, however, is distinguishable because of the

extensive disclaimer provision, including a statement by the

buyer that he inspected the car--a factor not present here.

Further, in Montana, unlike Wisconsin, there is a duty to

inspect independent of the "as is" clause. Hilger, 465 P.2d

at 837.

Knipp v. Weinbaum (Fla.App. 1977), 351 So.2d 1081, held

that the effect of an "as is" disclaimer on tort liability

depended on the interpretation the parties gave to the

disclaimer and was thus a question for the jury to decide.

In reaching its decision, the court stated:

> "The plaintiff in this case alleged that his
> injuries resulted from a defect in the goods
> sold. To foreclose consideration of his claim
> by permitting an 'as is' disclaimer to operate
> as an automatic absolution from responsibility
> through the mechanism of summary judgment would
> belie the policy behind Section 672.2-719(3),

which states that 'limitation of consequential
damages for injury to the person in the case of
consumer goods is prima facie unconscionable.
. . .

"Moreover, Section 672.2-316(3) provides:

"'(a) Unless the circumstances indicate other-
wise, all implied warrantites are excluded by
expressions like 'as is', 'with all faults'
or other language which in common understand-
ing calls the buyer's attention to the exclu-
sion of warranties and makes plain that there
is no implied warranty . . . '[Emphasis supplied.]

"It is the clause 'unless the circumstances in-
dicate otherwise' which precludes a finding
that automatic absolution can be achieved in
the sale of used consumer goods merely by the
inclusion in a bill of sale of the magic words
'as is.'

"This is not to say that a seller of used goods
may not absolve himself from responsibility for
defects in the goods sold when both he and the
buyer understand this to be the intended meaning
of the phrase 'as is.'  See Comment 3 to Section
672.2-719.  The Uniform Commercial Code contem-
plates that a seller may disclaim warranties as
long as the buyer reasonably understands this is
being done . . . But a disclaimer, to be effec-
tive, must be a part of the basis of the bargain
between the parties."  351 So.2d at 1084-85.
(Citations omitted.)

The court further stated:

"Even if the 'as is' term were to be found to
negate liability under the causes of action in
warranty, an issue by no means settled, the ab-
sence of warranties in the sale of chattel does
not necessarily preclude liability for negligence
. . . On the contrary, in the instant situation,
the 'as is' disclaimer serves to add another
dimension to the negligence claim, for its effect
on the evidence presented may be substantial,
especially on the question of whether or to what
degree the defendant owed a duty to the plaintiff.
The understanding of the parties as to the extent
of the disclaimer is particularly relevant to a
jury's determination of what was reasonable under
the circumstances . . . There remain disputed
facts as to the degree of care exercised by de-
fendants and the degree of care required of them.
Summary judgment on the negligence count is sin-
gularly inapt on the facts before us."  351 So.2d
at 1085-86.

Turner v. International Harvester Company, supra,

involved the "as is" sale of an International tractor-truck.

The court applied a strict liability standard to the seller
of defective used products. The court held that when
selling to the ordinary consumer a simple "as is" disclaimer
does not effectively insulate the dealer from a claim of
strict liability in tort following an accident which re-
sulted from a safety defect present in the vehicle when it
was in the control of the dealer. It stated:

> ". . . Bargaining power and ability to protect
> one's interests are generally disproportionate
> as between the buyer of used goods and one in
> the business of selling them. While freedom to
> contract need not be impaired if a buyer wishes
> to contract away his right to protection, an
> unequivocal waiver of safety defects must be
> shown. . . Otherwise, when the additional indi-
> rect costs will be borne by the public through
> insurance costs, a decent regard for the public
> safety requires the thumb of the State to be on
> the buyer's side of the scale . . ." 336 A.2d
> at 70-71. (Citations omitted.)

The court ultimately held that the issue of the effect of

the "as is" clause was a jury question:

> "The 'as is' notation, however, adds an addi-
> tional element to the negligence aspects of this
> case . . . But, does a disclaimer of statutory
> warranties also act as a waiver of both tort
> claims in strict liability and negligence? With-
> out any language of waiver, and without any evi-
> dence before this court that the 'as is' language
> was meant to serve as an intentional relinquish-
> ment of a known right, such effect will not be
> implied . . .

> "This determination, however, does not fully an-
> swer the question of the effect of the 'as is'
> statement, for it will have a very real eviden-
> tiary effect at the trial. What conditions did
> the 'as is' designation disclaim? A jury must
> eventually determine what was reasonable with
> respect to any proven danger present in a product
> sold 'as is.' Did the parties understand that
> the 'as is' designation applied only to body
> damage, gas mileage, worn tires or other such
> problems that could be discerned by a reasonable
> inspection or test drive? Was it limited to
> performance rather than safety defects? Was the
> designation intended to cover all defects?" 336
> A.2d at 72-73. (Citations omitted.)

In Fleming v. Stoddard Wendle Motor Co. (1967), 70 Wash.2d 465, 423 P.2d 926, a former owner of a pickup had modified its automatic transmission so that the motor would start even though the transmission was "in gear." When the former owner traded in the pickup, he did not disclose the modification to the automobile dealer. The court held the former owner subject to liability for the plaintiff's injuries, even though the trade-in was made "as is."

The facts of Fleming are easily distinguishable here. However, the court's discussion of the "as is" disclaimer is relevant:

> ". . . in certain circumstances . . . parties may bargain for exemption from liability for the consequences of negligence . . . However, in order to effectuate such a result, a provision for such an exemption must clearly express an intention to exclude liability for any and all harms however caused . . .
>
> "The significance of an 'as is' sale is that the goods are sold in the condition in which they are . . . Such a sale, unless otherwise provided in the contract, excludes and negatives warranties . . . In other words, the term 'as is' by itself amounts solely to a disclaimer of warranty.
>
> "The absence of warranties in the sale of chattels does not preclude liability for negligence . . ." 423 P.2d at 928.

In its discussion the court specifically distinguished Pokrajac and the "as is" holding in Thrash on much the same grounds as stated above.

In Kothe v. Tysdale (1951), 233 Minn. 163, 46 N.W.2d 233, the defendant asserted that his status was that of a seller of secondhand goods "as is" and that no liability attached to him as a vendor because of any defects therein.

The court disagreed and stated:

> "The authorities seem to clearly establish that either a vendor in a sale or a lessor in a lease of a vehicle intended to be used upon the public

-21-

highways owes a duty to the public using such
highways to exercise reasonable care in supplying
the purchaser or the lessee with a vehicle that
will not constitute a menace or source of danger
thereon; that liability attaches to such vendor
or lessor for injuries which are the result of
patent defects in the vehicle thus provided, or
if defects therein which could have been dis-
covered by the exercise of ordinary care; and
that such liability exists irrespective of any
contractual obligations between the parties to
the original transaction . . ." 46 N.W.2d at
236. (Citations omitted.)

It is clear that in Montana a used car dealer has a
duty to discover and repair any defects which are patent or
discoverable in the exercise of ordinary care. Hilger,
supra. It is equally clear that it is against the public
policy of this State to disclaim liability when performing
an act in the public interest. It cannot be denied that
inspecting used cars to insure their safe operation is an
act in the public interest.

In light of the above-enumerated public policies, we
find the better rule to be that the "as is" language does
not absolve used car dealers from tort liability for acci-
dents caused by defects in the car sold. This is especially
true in cases where, as here, there was a breach of a duty
to discover and repair the defects.

"Tort liability is not based upon representa-
tions or warranties. It is based on a duty
imposed by the law upon one who may foresee
that his actions or failure to act may result
in an injury to others." Gaidry Motors, supra,
268 S.W.2d at 629.

Here defendant failed to inspect the car for defects
before the sale to plaintiff. The defect would have been
discovered in a reasonable safety inspection. The defect
was the proximate cause of plaintiff's accident and sub-
sequent injuries. Defendant should not be allowed to hide
behind the cloak of a simple "as is" disclaimer. When the

ordinary person purchases a car "as is," he expects to have to perform certain repairs to keep the car in good condition. He does not expect to purchase a death trap. Public policy requires a used car dealer to inspect the cars he sells and to make sure they are in safe, working condition. This duty cannot be waived by the use of a magic talisman in the form of an "as is" provision. The trial court did not err in instructing the jury of defendant's duty to inspect and in suppressing evidence on the "as is" clause.

The second issue is whether the trial court erred in refusing to instruct on the defense of plaintiff's failure to use a seat belt.

The Montana statutes regarding seat belts are sections 61-9-409 and -410, MCA. Section 61-4-409 provides:

> "Seat belts required in new vehicles. It is unlawful for any person to buy, sell, lease, trade or transfer from or to Montana residents at retail an automobile which is manufactured or assembled commencing with the 1966 models unless such vehicle is equipped with safety belts installed for use in the left front and right front seats thereof, and no such vehicle shall be operated in this state unless such belts remain installed."

Section 61-9-410 deals with seat belt specifications.

There is no statutory requirement in Montana that a person must wear a seat belt while operating or riding in an automobile, nor are there any Montana cases on the subject. The seat belt defense has, however, been raised repeatedly in other jurisdictions with varying results.

Plaintiff contends that the overwhelming majority of jurisdictions are in accord that there is no common law duty to wear a seat belt, and absent a statute requiring the wearing of a seat belt, negligence cannot be predicated upon

-23-

failure to do so. She then lists numerous cases in jurisdictions rejecting the defense.

Defendant, on the other hand, contends that when a state has a comparative negligence rule, use of seat belts to mitigate the injury is always a proper question. It cites a few cases to support its viewpoint, and in its reply brief attempts to distinguish most of the cases plaintiff cites on the ground that they were decided in noncomparative negligence jurisdictions.

The overwhelming majority of the cases, be they from contributory negligence states or comparative negligence states, refuse to penalize a plaintiff for not using seat belts and have rejected the defense. Amend v. Bell (1977), 89 Wash.2d 124, 570 P.2d 138. See also: Barry v. Coca Cola Co. (1967), 99 N.J.Super. 270, 239 A.2d 273; Birdsong v. ITT Continental Baking Company (1974), 160 Ind. 411, 312 N.E.2d 104; Britton v. Doehring (1970), 286 Ala. 498, 242 So.2d 666; Brown v. Case (1974), 31 Conn.Sup. 207, 327 A.2d 267; Brown v. Kendrick (Fla.App. 1966), 192 So.2d 49; Cierpisz v. Singleton (1967), 247 Md. 215, 230 A.2d 629; D.W. Boutwell Butane Company v. Smith (Miss. 1971), 244 So.2d 11; Fields v. Volkswagen of America, Inc. (Okl. 1976), 555 P.2d 48; King Son Wong v. Carnation Company (Tex.Civ.App. 1974), 509 S.W.2d 385; Lawrence v. Westchester Fire Insurance Company (La. 1968), 213 So.2d 784; Lipscomb v. Diamiani (Dela. 1967), 226 A.2d 914; McCord v. Green (D.C. 1976), 362 A.2d 720; Miller v. Haynes (Mo. 1970), 454 S.W.2d 293; Miller v. Miller (1968), 273 N.C. 228, 160 S.E.2d 65; Fischer v. Moore (1973), 183 Colo. 392, 517 P.2d 458; Nash v. Kamrath (1974), 21 Ariz.App. 530, 521 P.2d 161; Placek v. City of Sterling Heights (1974), 52 Mich.App. 619, 217 N.W.2d 900; Robinson

v. Lewis (1969), 254 Or. 52, 457 P.2d 483; Selgado v. Commercial Warehouse Company (1975), 88 N.M. 579, 544 P.2d 719; Stallcup v. Taylor (1970), 62 Tenn.App. 407, 463 S.W.2d 416.

In Amend, supra, the defendants argued that under the doctrine of comparative negligence, evidence was admissible to prove that plaintiff's wife was not wearing an available harness seat belt. They further alleged that such failure either caused all her injuries, contributed to, enhanced or aggravated those injuries.

Before the passage of comparative negligence statutes, Washington held that failure to wear a seat belt was not contributory negligence. In Amend the defendants contended, as does defendant here, that the comparative negligence statute abrogated prior case law on the seat belt defense and therefore evidence on the defense was admissible. The court disagreed and stated:

> ". . . While the result of contributory negligence and comparative negligence is much different, both are premised upon negligence. In the one case we bar recovery, in the other we compare negligence and potentially reduce damages. However, in either case, we look to the negligence of the plaintiff.
>
> "The premise upon which negligence rests is that an actor has a legally imposed duty, i.e., a standard of conduct to which he must adhere. That duty may spring from a legislative enactment of the standard of conduct or from a judicially imposed standard. Deviation from that standard of conduct must occur to have negligence. [Citation omitted.]
>
> "Our legislature has not mandated the use of seat belts as a standard of conduct. RCW 46.37.510 only requires installation of front seat belts on automobiles manufactured after 1964 [similar to Montana]. We have held, along with the vast majority of other states, that such a statute does not make mandatory the use of the seat belts. [Citation omitted.]
>
> "The question then is whether the court should impose a standard of conduct upon all persons riding in vehicles equipped with seat belts. We think we should not.

"The defendant should not diminish the consequences of his negligence by the failure of the plaintiff to anticipate the defendant's negligence in causing the accident itself. Only if plaintiff should have so anticipated the accident can it be said that plaintiff had a duty to fasten the seat belt prior to the accident.

"There are a number of reasons why we reach this conclusion. We have noted that the plaintiff need not predict the negligence of the defendant. Second, seat belts are not required in all vehicles. Defendant should not be entitled to take advantage of the fortuitous circumstance that plaintiff was riding in a car so equipped.

"Third, while not controlling as to the standard of conduct, it is a fact and persuasive that the majority of motorists do not habitually use their seat belts. Studies show that as many as two-thirds of observed drivers did not use seat belts. 'Belt Use '76,' Insurance Institute for Highway Safety, 1976. Belt use by passengers and children is even lower, one research paper revealing that 93 percent of observed children under 10 were not restrained by belts and 89 percent of passengers 10 years or older were not using available belts. Alan F. Williams, 'Observed Child Restraint Use in Automobiles,' The American Journal of Diseases of Children, vol. 130, December 1976.

"Fourth, allowing the seat belt defense would lead to a veritable battle of experts as to what injuries would have or have not been avoided had the plaintiff been wearing a belt. At best it would cause substantial speculation by the trier of the facts." Amend v. Bell, supra, 570 P.2d at 143.

In Fischer v. Moore, supra, the court stated:

"We conclude, as the Court of Appeals has, that the failure of the driver or passenger in a motor vehicle to use a seat belt does not constitute contributory negligence and may not be pleaded as a bar to recovery of damages in an action against a tort-feasor whose negligence provides the initiating force and is a proximate cause of an injury to a driver or passenger. [Citation omitted.] If we were to hold otherwise, the person who was driving a Volkswagen, and not a Mack Truck, could be said to be more vulnerable to injury and, therefore, guilty of contributing to his own injury as a matter of law. Such a result would be contrary to the entire 'fault' philosophy which is found throughout the law of tort.

"Moreover, to us, it would be improper for an injured driver or passenger to be penalized in the eyes of the jury by permitting evidence to be presented that a seat belt was available which had not been put in use. The seat belt defense would soon become a fortuitous windfall to tort-feasors and would tend to cause rampant speculation as to the reduction (or increase) in the amount of recoverable damages attributable to the failure to use available seat belts. [Citations omitted.] In comparing the cases which we have cited, it is apparent that the acceptance of the seat belt defense can only be justified as a deviation from common-law negligence on a public policy theory. [Citation omitted.] The legislature, and not the judiciary, serves as the barometer of public policy in Colorado. Prior to the adoption of our comparative negligence statute, the legislature did not enact, although it considered, seat belt legislation. Therefore, we are not inclined to alter the common law in the face of the legislature's failure to act in order to create a negligence defense which is wholly grounded on public policy considerations.

"In short, the seat belt defense, under the law that existed prior to the adoption of our comparative negligence statute, is not an affirmative defense to an action for negligence, and evidence that the injured party failed to wear a seat belt may not be brought before the jury in any form to establish contributory negligence or to reduce the amount of the injured party's damages." 517 P.2d at 459-60.

Other cases which leave such a decision up to the legislature or refuse to enforce a seat belt defense on the basis of statutes similar to Montana's are: Britton v. Doehring, supra, 242 So.2d at 675; D. W. Boutwell Butane Company v. Smith, supra, 244 So.2d at 12; Miller v. Haynes, supra, 454 S.W.2d at 301; Miller v. Miller, supra, 160 S.E.2d at 73; Fields v. Volkswagen of America, Inc., supra, 555 P.2d at 62. Two of the above cases give comprehensive discussions concerning the use and practicality of seat belts. Both reject the seat belt defense and cite numerous cases in support of this rejection.

Based on a lengthy discussion and a review of the case law, the court in Miller v. Miller, supra, stated:

-27-

"It would be a harsh and unsound rule which would deny all recovery to the plaintiff, whose mere failure to buckle his belt in no way contributed to the accident, and exonerate the active tortfeasor but for whose negligence the plaintiff's omission would have been harmless. [Citation omitted.] Furthermore, it is doubtful that such a rule would increase the use of seat belts. In the case comment on Brown v. Kendrick, supra, 39 Colo.L.Rev. 605, 608, it is said, '[I]mposing an affirmative legal duty of wearing seat belts will have virtually no effect on the actual seat-belt wearing habits of automobile occupants. Its only effect would be to give an admitted wrongdoer a chance to dodge a substantial portion of his liability.' It could never, of course, defeat a plaintiff's claim for property damage.

"Needless to say, the seat-belt defense, which would bar an otherwise wholly innocent victim, would not be popular with the jury or trier of facts. [Citations omitted.]

"Due care is measured by the customary conduct of the reasonably prudent man. The scant use which the average motorist makes of his seat belt, plus the fact that there is no standard for deciding when it is negligence not to use an available seat belt, indicates that the court should not impose a duty upon motorists to use them routinely whenever he travels upon the highway. If this is to be done, it should be done by the legislature. [Citation omitted.]" 160 S.E.2d at 73.

In McCord v. Green, supra, the court cited _Miller_ extensively and concluded:

"'Unfortunately, the use of occupant restraints has traditionally been low in this country. Even now, the average use rate for cars of all model years is about 5 percent for lap and shoulder belts and 25 percent for lap belts alone.'

"To characterize plaintiff's behavior in this case as lacking in ordinary prudence would be paradoxical, as it did not differ from that of 75% of the motorists in this country with respect to the use of seat belts." 362 A.2d at 725. (Citation omitted.) See also, Romankewiz v. Black (1969), 16 Mich.App. 119, 167 N.W.2d 606, 609, and Nash v. Kamrath, supra, 521 P.2d at 163-64.

Although the study quoted in McCord v. Green, supra, was conducted over a decade ago, it is apparently still applicable today. Witness this discussion from Fields v. Volkswagen of America, Inc., supra:

"This is a question of first impression in this court. There is no common law or statutory duty requiring the use of seat belts. Imposition of new and recent technological advances are not usually inducted into doctrines of law, until such time as they have been sufficiently tried, proven and accepted for the purpose they were intended. Historically, the seat belt phenomenon is in its infancy. It is in a state of influx.

". . .

"Both industry and government are now aware that while seat belts are beneficial, their use and acceptance cannot be arbitrarily thrust upon the traveling public. Consequentially, on October 28, 1974, the controversial mandatory seat belt interlock system was withdrawn and industry has intensified its research to determine other possible alternatives.

"If the appellants in this case are guilty of the acts of negligence as alleged, which caused the accident and resulting injuries, then they should be held accountable as constitutionally and statutorily required. If the allegations of negligence are true, appellee did nothing to cause the accident. Should he be required to anticipate the negligence of the appellants? We think not. One's duty to mitigate damages cannot arise before he is damaged. The failure to minimize must occur after the injury. At most the failure of the appellee to use the seat belt merely furnished a condition by which the injury was possible. It did not contribute to or cause the accident. It is well established in our court that if the negligence merely furnishes a condition by which the injury was possible, and a subsequent act caused the injury, the existence of such a condition is not the proximate cause of the injury.

"Although there is a conflict in other jurisdictions who have been confronted with this issue, the majority of the cases hold that the failure to use seat belts is not a defense to establish contributory negligence or to reduce the amount of damages to the injured party.

"In view of the lack of unanimity on a proper seat belt system, the lack of public acceptance, and in the absence of any common law or statutory duty, we find that evidence of the failure to use seat belts is not admissible to establish a defense of contributory negligence or to be considered in mitigation of damages. For the present time we await the direction of the legislature." 555 P.2d at 61-62.

On the other side of the coin is Bentzler v. Braun
(1967), 34 Wisc.2d 362, 149 N.W.2d 626. The court in
Bentzler stated:

> "While we agree with those courts that have con-
> cluded that it is not negligence per se to fail
> to use seat belts where the only statutory stan-
> dard is one that requires the installation of
> the seat belts in the vehicle, we nevertheless
> conclude that there is a duty, based on the
> common law standard of ordinary care, to use
> available seat belts independent of any statu-
> tory mandate.
>
> ". . .
>
> "We therefore conclude that, in those cases where
> seat belts are available and there is evidence
> before the jury indicating causal relationship
> between the injuries sustained and the failure to
> use seat belts, it is proper and necessary to
> instruct the jury in that regard. A jury in
> such case could conclude that an occupant of an
> automobile is negligent in failing to use seat
> belts. . ." 149 N.W.2d at 639, 640.

However, the court held that the trial judge had properly

refused a requested instruction on the seat belt defense:

> "There was proof that seat belts were available
> and were not used, but that fact alone does not
> prove causation, for the driver of the vehicle
> also failed to use the available seat belts,
> but his injuries were minimal." 149 N.W.2d at
> 640.

See also Sams v. Sams (1966), 247 S.C. 471, 148 S.E.2d 154.

Illustrative of the cases which state that upon one or

both of these aspects, the defense must be submitted to the

jury are: Dudanas v. Plate (1976), 44 Ill.App.3d 901, 3

Ill.Dec. 486, 358 N.E.2d 1171; Spier v. Barker (1974), 35

N.Y.2d 444, 323 N.E.2d 164.

In light of the history and the numerous legislative

problems that must be considered to effectively extend the

seat belt rule of law, we have concluded that the well-

reasoned position of the Washington court in Amend v. Bell,

supra, produces the better rule and reach the conclusion

that to adopt a seat belt defense when the legislature has failed to do so would be ill-advised. The trial court properly refused to allow defendant to introduce a seat belt defense into this case.

The third issue is whether the trial court erred in refusing to present to the jury the question of assumption of risk, both contractual and noncontractual.

Defendant contends that the trial court mistakenly acted on the assumption that the comparative negligence statute merged the defense and erred in refusing to instruct separately on the issue of the defense.

Plaintiff initially contends that "assumption of risk" is not involved here because the traditional elements of assumption of risk are not involved. Plaintiff further asserts that even if the doctrine applies here, it is no longer a separate affirmative defense but merely one form of contributory fault to be compared, which the jury did.

We agree with plaintiff that the doctrine of assumption of risk does not apply in the instant case.

Historically in Montana, the defense of assumption of risk required: "(1) knowledge, actual or implied, of the particular condition creating the risk, (2) appreciation of this condition as dangerous, (3) a voluntary remaining or continuing in the face of the known dangerous condition, and (4) injury resulting as the usual and probable consequence of the dangerous condition." Hanson v. Colgrove (1968), 152 Mont. 161, 447 P.2d 486, 488. (Emphasis added.) See also Dean v. First National Bank of Great Falls (1969), 152 Mont. 474, 452 P.2d 402, 405. Here, there is no evidence that plaintiff knew of the particular condition which caused the accident. ". . . Assumption of risk is governed by the

subjective standard of the plaintiff rather than the objective standard of the reasonable man . . ." Deeds v. United States (D. Mont. 1969), 306 F.Supp. 348, 363.

In Brown v. North Am. Mfg. Co. (1978), ___ Mont. ____, 576 P.2d 711, 35 St.Rep. 194, this Court quoted from Dorsey v. Yoder Company (E.D. Pa. 1971), 331 F.Supp. 753, and stated:

> "Quoting 2 Restatement of Torts 2d, §496D, Comment (c), the court in Dorsey continued:
>
> "'"The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence. * * * If by reason of age, or lack of information, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to assume the risk, although it may be found that his conduct is contributory negligence because it does not conform to the community standard of the reasonable man."'" 576 P.2d at 719. (Emphasis supplied.)

Our discussion above on the "as is" defense indicates that plaintiff did not contractually assume the risk of the defective condition, nor did she impliedly assume it. To assume the risk, one must have knowledge of the particular condition that creates such risk. Such knowledge was lacking on the part of plaintiff. Defendant here has failed to prove the requisite elements of the defense of assumption of risk. The trial court properly refused to instruct the jury on assumption of risk.

Although we do not apply the doctrine in this case, it would be helpful to discuss its application since the recent passage of the comparative negligence statute. Defendant contends that because Montana recognized that the defenses of assumption of risk and contributory negligence were separate defenses requiring separate instructions before the

passage of comparative negligence, the same result should accrue after adoption of comparative negligence. Plaintiff contends that assumption of risk should be merged into the general scheme of assessment of liability in proportion to fault and should not be a separate defense, and that if a state, like Montana, recognized that assumption of risk and contributory negligence were separate defenses, they have consistently retained "assumption of risk" as a separate defense under comparative negligence rules. Arkansas Kraft Corporation v. Johnson (1975), 257 Ark. 629, 519 S.W.2d 74; Blum v. Brichacek (1974), 191 Neb. 457, 215 N.W.2d 888; O'Brien v. Smith Brothers Engine Rebuilders, Inc. (Tenn.App. 1973), 494 S.W.2d 787. Defendant argues that Montana should follow the above jurisdictions and retain the distinction. To do otherwise, it contends, would be to change the statute itself as to comparative negligence.

Defendant also distinguishes the cases cited by plaintiff arguing that the decisions made in those states before comparative negligence were different from Montana's. Defendant is correct in its conclusion that prior to the adoption of comparative negligence, Montana distinguished between contributory negligence and assumption of risk, Deeds v. United States, supra, 306 F.Supp. at 362-363, and allowed the giving of separate instructions on the two issues. Hoffman v. Herzog (1971), 158 Mont. 296, 491 P.2d 713.

The cases it cites, however, do not discuss the effect of a comparative negligence statute on separability of the defenses of assumption of risk and comparative negligence and are not good authority for defendant's argument since

the precise issue presented here was not before the respective courts.

Plaintiff contends that under comparative negligence, the issue of assumption of risk is just one of the factors to be considered in determining plaintiff's contributory negligence.

In Li v. Yellow Cab Company of California (1975), 119 Cal.Rptr. 858, 532 P.2d 1226, the California Supreme Court judicially adopted the doctrine of comparative negligence. The court discussed the question of the effect of comparative negligence on the doctrines of assumption of risk and last clear chance and concluded that neither of these two doctrines were actually necessary under comparative negligence. The court stated:

> "The third area of concern, the status of the doctrines of last clear chance and assumption of risk, involves less the practical problems of administering a particular form of comparative negligence than it does a definition of the theoretical outline of the specific form to be adopted. Although several states which apply comparative negligence concepts retain the last clear chance doctrine [citation omitted], the better reasoned position seems to be that when true comparative negligence is adopted, the need for last clear chance as a palliative of the hardships of the 'all-or-nothing' rule disappears and its retention results only in a windfall to the plaintiff in direct contravention of the principle of liability in proportion to fault. [Citations omitted.] As for assumption of risk, we have recognized in this state that this defense overlaps that of contributory negligence to some extent and in fact is made up of at least two distinct defenses. 'To simplify greatly, it has been observed . . . that in one kind of situation, to wit, where a plaintiff unreasonably undertakes to encounter a specific known risk imposed by a defendant's negligence, plaintiff's conduct, although he may encounter that risk in a prudent manner, is in reality a form of contributory negligence . . . Other kinds of situations within the doctrine of assumption of risk are those, for example, where plaintiff is held to agree to relieve defendant of an obligation of reasonable conduct toward him. Such a situation would

not involve contributory negligence, but rather a reduction of defendant's duty of care.' [Citations omitted.] We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence. [Citations omitted.]" 532 P.2d at 1240-41.

Minnesota has held that implied assumption of risk as an affirmative defense in tort actions is to be limited to those situations in which the voluntary encounter with a known and appreciated risk is unreasonable. As such, it is to be considered merely as a phase of contributory negligence, to be submitted with and apportioned under, the comparative negligence doctrine. Springrose v. Willmore (1971), 292 Minn. 23, 192 N.W.2d 826.

". . . The doctrine of implied assumption of risk must, in our view, be recast as an aspect of contributory negligence, meaning that the plaintiff's assumption of risk must be not only voluntary but, under all the circumstances, unreasonable . . . The practical and most important impact of this decision is to mandate that, like any other form of contributory negligence, assumption of risk must be apportioned under our comparative negligence statute . . ." 192 N.W.2d at 827. [Citations omitted.]

In Lyons v. Redding Construction Company (1973), 83 Wash.2d 86, 515 P.2d 821, the court stated:

". . . Adoption of the standard of comparative negligence is necessarily accompanied by a more flexible weighing of the relative fault attributable to each party. A concomitant effect of this more delicate apportionment of damages will be the elimination of the need for the assumption of the risk doctrine. Thus, the calculus of balancing the relative measurements of fault inevitably incorporates the degree to which the plaintiff assumed the risk. Accordingly, it has been held the effect of the comparative negligence standard shall be to completely abrogate the assumption of risk doctrine as known and applied heretofore." 515 P.2d at 826.

See also Colson v. Rule (1962), 15 Wisc.2d 387, 113 N.W.2d 21.

In Wilson v. Gordon (Me. 1976), 354 A.2d 398, the Maine court presents an excellent discussion on this issue. It states:

> "Contractual assumption of the risk is not inconsistent with the Maine comparative negligence statute. On the other hand, voluntary assumption of the risk . . . is but a form of contributory fault. That being so, our comparative negligence statute is clearly intended to abolish the doctrine of so-called voluntary assumption of the risk.

> "While it is true that 14 M.R.S.A. §156 does not specifically abolish the defense of assumption of the risk, in most cases the apportionment of fault which the statute is designed to effectuate obviates the need for and alleviates much of the harshness of that common law doctrine. In those cases where assumption of the risk is based upon the plaintiff's lack of due care in encountering a known risk created by the negligence of the defendant--so-called 'voluntary' assumption of the risk--the concept overlaps contributory fault. In such circumstances the plaintiff's conduct should be judged in terms of contributory fault and weighed against the causal negligence of the defendant. This approach avoids the harsh 'all or nothing' effect of assumption of the risk while at the same time permitting a defendant to reduce his liability for damages when he can demonstrate that the plaintiff's fault contributed to the injuries.

> "The treatment of assumption of the risk which we today adopt has long been advocated by Dean Prosser and seems to represent the approach adhered to by most of the courts which have recently dealt with the question.

> "Some jurisdictions have abolished the defense of assumption of the risk, except where the risk was contractually assumed, without any reference to whether or not a comparative negligence statute had been adopted. Alaska, Leavitt v. Gillaspie, Alaska, 443 P.2d 61 (1968); Hawaii, Bulatao v. Kauai Motors, Ltd., 49 Hawaii 1, 406 P.2d 887 (1965); Iowa, Rosenau v. City of Estherville, Iowa, 199 N.W.2d 125 (1972); Kentucky, Parker v. Redden, Ky., 421 S.W.2d 586 (1967); Michigan, Felgner v. Anderson, 375 Mich. 23, 133 N.W.2d 136 (1965); New Hampshire, Bolduc v. Crain, 104 N.H. 163, 181 A.2d 641 (1962); New Jersey, Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90 (1959), and McGrath v. American Cyanamid 41 N.J. 272, 196 A.2d 238 (1963); New Mexico, Williamson v. Smith, 83 N.M. 336, 491 P.2d 1147 (1972); Oregon, Ritter v. Beals, 225 Or. 504, 358 P.2d 1080 (1961); Wisconsin, Gilson v. Drees Bros., 19 Wis.2d 252, 120 N.W.2d 63 (1963).

"In Meistrich, supra, Chief Justice Weintraub expounded upon the confusion which has been wrought by the indiscriminate use of the term 'assumption of the risk.' He emphasized the distinction between 'primary' assumption of the risk (i.e., contractual) and 'secondary' assumption of the risk (i.e., implied or voluntary) and concluded:

"'We are satisfied there is no reason to charge assumption of the risk in its secondary sense as something distinct from contributory negligence, and hence that where the thought is projected in that aspect, the terminology of assumption of the risk should not be used. Rather . . . the subject should be subsumed under the charge of contributory negligence.' 155 A.2d at 96.

"Other courts have interpreted their comparative negligence statutes as eliminating the need for assumption of the risk where the defense can be said to overlap with contributory negligence. California, Li v. Yellow Cab Co. of Calif., 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975); Minnesota, Springrose v. Willmore, 292 Minn. 23, 192 N.W.2d 826 (1971); Mississippi, Braswell v. Economy Supply Co., Miss., 281 So.2d 669 (1973); and Washington, Lyons v. Redding Construction Co., 83 Wash.2d 86, 515 P.2d 821 (1973).

"A statement of the California court in the Li case is representative of the reasoning which pervades all of the above opinions:

"'We think it clear that the adoption of a system of comparative negligence should entail the merger of the defense of assumption of the risk into the general scheme of assessment of liability in proportion to fault in those particular cases in which the form of assumption of risk involved is no more than a variant of contributory negligence.' 119 Cal.Rptr. at 873, 532 P.2d at 1241.

"There appear to be few jurisdictions which adhere to the position that comparative negligence and voluntary assumption of the risk can be harmonized. See Bugh v. Webb, 231 Ark. 27, 328 S.W.2d 379 (1959); Harris v. Hercules, Inc., 328 F.Supp. 360 (E.D. Ark. 1971).

"Appellant directs us to a Florida case, Dorta v. Blackburn, Fla.App., 302 So.2d 450 (1973), in which a Florida District Court of Appeals held that the Florida State Supreme Court

"'appears to have recognized the continued existence of the common law defense of assumption of the risk notwithstanding its adoption of the doctrine of comparative negligence.' 302 So.2d at 451.

-37-

"More recently, however, another Florida District Court of Appeals took a contrary approach, holding that

"'[t]he defense of assumption of the risk is no less "a primitive device of achieving justice between parties who are both at fault" than was contributory negligence. It should meet the same fate as contributory negligence and not constitute a complete bar to recovery where comparative negligence is the measuring standard for recovery.' Rea v. Leadership Housing, Inc., Fla.App., 312 So.2d 818, 822 (1975)." 354 A.2d at 401-403.

The Wilson court concluded with a statement which is applicable to our decision here.

"Since, in the case now before us, it cannot be seriously contended that the appellee contractually assumed the risk of his injury and since we now decide that the doctrine of voluntary assumption of the risk is no longer viable, it is evident that appellant's request for an instruction on assumption of the risk was properly denied." 354 A.2d at 403.

As stated earlier, the elements of the doctrine of assumption of the risk are not present in this case. However, when this situation does arise, we will follow the modern trend and treat assumption of the risk like any other form of contributory negligence and apportion it under the comparative negligence statute.

The fourth issue is whether the District Court erred in not granting summary judgment on plaintiff's Count No. II.

Count II of the complaint is identical to Count I except for an addition which, in effect, claims misrepresentation as to the odometer reading. Count II states in pertinent part: "If said vehicle had not been driven an additional forty thousand miles than was represented to plaintiff, plaintiff alleges on information and belief that the accident which is the subject of this action would not have occurred."

-38-

Defendant contends that plaintiff "has misunderstood" the Montana Unfair Trade Practices and Consumer Protection Act and specifically sections 30-14-103 and 30-14-104, MCA. Defendant states that under the Act, the Department of Business Regulations may only adopt rules not inconsistent with the federal Act and decisions thereunder. It contends a reading of the cases annotated under 15 U.S.C.A. §45 (1973) shows that the purpose of the federal statutes is to prevent unlawful restraint of trade and submits that since the Montana Department of Business Regulations may not adopt rules inconsistent with the federal law, it is improper to have a regulation which deals with sales. Such regulation is, according to defendant, outside the scope of the enabling legislation.

Defendant's arguments are misplaced.

Section 30-14-103, MCA, states:

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

Section 30-14-104, MCA, provides:

"1. It is the intent of the legislature that in construing Section 30-14-103 due consideration and weight shall be given to the interpretations of the federal trade commission and the federal courts relating to section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., 45(a)(1)), as amended.

"2. The Department may make rules interpreting the provisions of 30-14-103. Such rules shall not be inconsistent with the rules, regulations, and decisions of the federal trade commission and the federal courts in interpreting the provisions of section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C., 45(a)(1)), as amended."

A.R.M. §8-2.4(2)-S440 provides in part:

"It shall be an unfair or deceptive act or practice for a motor vehicle dealer to:

" . . .

-39-

"(3) represent the previous usage or status of a motor vehicle to be something that, in fact, it was not; or make such representations unless the dealer has sufficient information to support the representations."

Section 30-14-133, MCA, provides in part:

"(1) Any person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by 30-14-103 may bring an individual but not a class action under the rules of civil procedure in the district court of the county in which the seller or lessor resides or has his principal place of business or is doing business to recover actual damages or $200, whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained and may provide such equitable relief as it considers necessary or proper."

While the main purpose of the federal statute is to prevent unlawful restraint of trade, there is nothing in the cases to indicate that the above rule of the Department of Business Regulations is inconsistent with the federal cases or the enabling legislation.

The District Court was therefore correct in denying summary judgment on this matter. A determination of whether the alleged violation was a cause of plaintiff's damages is a question of fact for the jury to determine. As such, it was not ripe for summary judgment.

As part of defendant's case-in-chief, counsel for defendant attempted to impeach plaintiff by introducing in evidence a deposition taken of plaintiff by defendant prior to trial. Objection was made upon the grounds of repetition, inadmissibility of the deposition and improper impeachment evidence. The court adjourned to chambers to hear the evidence and argument, and after offer of proof, denied the use of the deposition as proposed.

The District Court was correct in so ruling under the circumstances in this case. Plaintiff had been extensively cross-examined by defendant during plaintiff's case-in-chief. She had gone to her home because of her physical condition and was not present at the time the deposition was offered, nor at the time of the offer of proof (though defendant asked that she be returned to court for the purpose of using the deposition).

The issue presents a question of interpreting what the rules allow regarding depositions used for impeachment purposes. It is to be noted that Rule 32(b), M.R.Civ.P., provides:

> ". . . objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."

The matter is governed by the provisions of Montana Rules of Evidence, Rule 613. That rule provides:

> "(a) _Examining Witness Concerning Prior Statement._ In examining a witness concerning a prior statement made by him, whether written or not, the statement need not be shown or its contents disclosed to him at that time, but on request the same shall be shown or disclosed to opposing counsel.

> "(b) _Extrinsic Evidence of Prior Inconsistent Statement of Witness._ Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2)."

This rule is fairly new, and practitioners would be well-advised to study its provisions. If the witness is on the stand and testifying, a cross-examiner may ask the witness about prior statements made by the witness, without

first showing the witness the written deposition or writing in which the prior statement is contained. This is a permitted departure from the former practice, where, in impeachment, it was required that the writing containing the prior inconsistent statement be first shown to the witness.

The method chosen by the cross-examiner in this case, however, violated the provisions of subdivision (b) of Rule 613. The witness was not on the stand. The cross-examiner proposed to offer in evidence, in the absence of the witness, a deposition taken of the witness pretrial for the purpose of impeachment. Thus the deposition itself was extrinsic evidence of a prior inconsistent statement. It was not admissible unless the witness had an opportunity to explain or deny the same, and the opposite party was afforded an opportunity to interrogate her on the deposition. This foundational requirement not having been met by the cross-examiner, the District Court was correct in denying the admission into evidence of the deposition or any part of it under Rule 613(b), Mont.R.Evid., and the provisions of Rule 32(b), M.R.Civ.P., foregoing.

It is, of course, not necessary under the new rules of evidence that impeachment evidence of prior inconsistent statements be offered during the cross-examination of the witness. Under Rule 613(b) it can be done at any time during the trial (see Advisory Committee's Note under section 613, Federal Rules of Evidence). Thus in a proper case, a party may demand a return to the stand of any witness not excused for the purposes of impeachment through prior inconsistent statements. Here that demand was properly denied by the District Court on the grounds of repetition of the proposed testimony. Its discretion on that

point governs us, and we agree the proposed evidence would have been repetitious. In any event, however, the deposition itself, as extrinsic evidence, is admissible only under the conditions of Rule 613(b), Mont.R.Evid. Therefore, no error occurred in this trial respecting the proferred impeachment evidence.

Plaintiff raises as an issue on cross-appeal whether the jury's reduction of damages from $650,000 to $422,500 should be sustained. It appears that plaintiff made no objection at the trial on this issue. Generally, we will not consider issues raised for the first time on appeal. Hash v. Montana Power Co. (1974), 164 Mont. 493, 524 P.2d 1092.

Even if this question were to be considered by this Court under a comparative negligence scheme, the question of plaintiff's negligence is a question of fact for the jury to decide. Our function is to determine whether there is substantial credible evidence to support the jury verdict. To this end we must review the evidence in the light most favorable to the prevailing party in the District Court. Noll v. City of Bozeman (1977), 172 Mont. 447, 564 P.2d 1296.

The jury was entitled under the facts presented to find as it did. We find sufficient credible evidence to support the verdict of the jury on all questions.

The remaining issues raised by both parties present alleged elements of error, which even if true, would not be reversible error. Discussion of those issues is therefore unnecessary.

In conclusion, the case under consideration was deemed submitted at the close of oral arguments, and no permission to plead further being granted, the supplemental briefs of the parties were neither accepted nor considered in this cause.

The judgment of the District Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

Mr. Justice John Conway Harrison concurring in part and dissenting in part:

I concur with all issues with the exception of the seat belt issue with which I respectfully dissent. I would return the case to the court for retrial for failure to give the requested instructions on the use of seat belts.

If ever there was a case presented to this Court indicating the necessity of using seat belts, this is the case. The very fact that respondent and her husband, from the very time of purchase, had difficulties with the car and sought the advice of a friend who was a mechanic, indicates that respondent knew the car's condition and should have worn seat belts during any drive that she took in the car. Before purchasing the car she and her husband took the car out for a test drive and they noted it had a tendency to pull to the left. When they took the car back, she did not have the same repaired before purchasing it from the dealer.

Immediately thereafter respondent drove the car to Missoula, where she took it to a friend's garage. He indicated after working on the car that she should take the car back; that it needed lots of work and was "not safe on the road." Despite that advice, she drove back from Missoula to Great Falls and noticed that the car lost power due to extreme vibration, that it "dieseled", and that the motor continued to run some time after the ignition had been turned off. When she got home her husband tested the car and noted some difficulty with the steering. In addition, the day she drove the car to Chester to see Dr. Buker, she did so against the advice of her husband who felt that the car should not be on the road and that she should take the other family car.

Under these circumstances, and considering the accident where she drove off the road and was thrown out of the car, there is no question that her failure to "belt up" contributed to the seriousness of her injuries.

There is no dispute that the Datsun had seat belts, and respondent's testimony was that it was her custom or habit to wear a seat belt when driving. The very condition of the car itself warranted the conclusion that respondent's injuries would have been minimal had she worn the seat belt and thus remained inside the car.

The Court, obviously, holds as a matter of law that under no circumstances could the defense of the failure to wear a seat belt be considered. In my opinion, that is error.

Recognizing that my view is a minority view, I find it is the better view and should be stated. The support for my view comes initially from Sams v. Sams (1966), 247 S.C. 471, 148 S.E.2d 154, in which the matter was considered. The court there held:

> "Simply stated, the question before us is whether the pleading should have been stricken, or, on the other hand, should the defendant be allowed to prove, if he can, that the failure of the plaintiff to use a seat belt, under the facts and circumstances of this case, amounted to a failure to exercise such due care as a person of ordinary reason and prudence would have exercised under the same circumstances, and that such failure constituted a contributing proximate cause of plaintiff's injuries. We think that the pleading should not have been stricken and that the ultimate questions raised by the alleged defense should be decided in the light of all of the facts and circumstances adduced upon the trial, rather than being decided simply upon pleadings." 148 S.E.2d at 155.

The Sams case was followed very shortly by the Wisconsin case of Bentzler v. Braun (1967), 34 Wisc.2d 362, 149 N.W.2d

-46-

626, in which the court made the following rulings: (1) the failure to use seat belts is not negligence per se under statutes like Montana's section 61-9-409, MCA, but, ". . . we nevertheless conclude there is a duty, based on the common law standard of ordinary care, to use available seat belts independent of any statutory mandate"; (2) the occupant of a car is charged with knowledge of the additional safety factor produced by the use of a seat belt; and (3) the test is: did the failure to use the seat belts contribute to the injury?

> "We therefore conclude that, in those cases where seat belts are available and there is evidence before the jury indicating causal relationship between the injuries sustained and the failure to use seat belts, it is proper and necessary to instruct the jury in that regard. A jury in such case could conclude that an occupant of an automobile is negligent in failing to use the seat belts. . ." 149 N.W.2d at 640.

Here the evidence shows that respondent, from her own experience, had trouble with the car and had been warned, at least by the mechanic Marquart and I think also by her husband, that the vehicle was unsafe. Inasmuch as we are at the threshold of the opinion stage of comparative negligence in Montana, under the circumstances here, I think that because the alleged negligence of appellant had been discovered before the accident a jury question exists on the use of seat belts. I believe first, that where a state has a comparative negligence rule, the matter of the use of seat belts to mitigate an injury is always a proper question, and second, if the plaintiff's failure to use a seat belt occurred, there is a jury question as to avoidable consequences. See King Son Wong v. Carnation Company (Tex.Civ.App. 1974), 509 S.W.2d 385, 386-87.

John Conway Harrison
Justice

-47-